**Teresa L. MERCER, Plaintiff,**

v.

**CITY OF CEDAR RAPIDS and William J. Byrne, Defendant.**

**No. C98–0143–MWB.**

United States District Court, N.D. Iowa, Cedar Rapids Division.

July 19, 2000.

Mark J. Seidl, Seidl & Chicchelly, Marion, IA, for Plaintiff.

Mohammad H. Sheronick, City Attorney, Cedar Rapids, IA, for Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

TABLE OF CONTENTS

I. *INTRODUCTION* ......................................................1135
 A. *Procedural Background* ...............................................1135
 B. *Factual Background* .................................................1136

II. *LEGAL ANALYSIS*......................................................1139
 A. *Standards For Summary Judgment*.......................................1139

B. Constitutional Claims ............................................. 1140
 1. Mercer's equal protection claim ............................. 1140
 a. Elements of the claim ................................. 1140
 b. Were Mercer and Peters "similarly situated"? ......... 1141
 i. The defendants' difference based on "rank" ..... 1142
 ii. The plaintiff's "accusation of the same conduct" test .......... 1142
 iii. The proper test ................................ 1143
 iv. "Probationary" versus "permanent" status ...... 1144
 v. The difference in legal status here ............ 1146
 2. Mercer's due process claim ................................ 1147
 a. Waiver of the "procedural" due process claim ......... 1148
 b. Sufficiency of the "stigma" to sustain a "procedural" due process
 claim ................................................. 1149
 i. Nature of the stigma or obloquy ................ 1150
 ii. Comments on professional competence ........... 1151
 iii. "Stigma" from Chief Byrne's comments .......... 1152
 c. The "substantive" due process claim .................. 1153
 3. Qualified immunity and municipal liability ................ 1154
C. The Sex Discrimination Claims .................................. 1155
 1. The Reeves decision and the burden-shifting analysis ...... 1156
 2. Application of the burden-shifting analysis ............... 1158
 a. Mercer's prima facie case ............................ 1158
 b. The defendants' legitimate, non-discriminatory reason ... 1160
 c. Proof of "pretext" and "intentional discrimination" ... 1161
 i. The third-stage analysis under Reeves .......... 1162
 ii. The role of evidence of disparate treatment .... 1163
 iii. Mercer's third-stage showing ................... 1164
D. Slander ....................................................... 1166
 1. The "twin torts" of libel and slander ..................... 1167
 2. Qualified privilege ....................................... 1167
 a. Communication to the general public .................. 1168
 b. "Actual malice" and qualified privilege .............. 1169
 3. Slander and slander "per se" .............................. 1170
 4. Falsity ................................................... 1172
E. Wrongful Discharge ............................................ 1173
 1. Analytical framework ...................................... 1173
 2. Determining public policy ................................. 1175
 a. Public policy protection for a private, consensual relationship ....... 1175
 b. Public policy protection for contact with Commissioner Evans ...... 1176
 3. Jeopardy to public policy ................................. 1177
 4. Summary ................................................... 1180

III. CONCLUSION ................................................... 1180

Undaunted by denial of their previous motion to dismiss the plaintiff's federal civil rights claims arising from the plaintiff's discharge from her position as a probationary police officer, *see generally Mercer v. City of Cedar Rapids*, 79 F.Supp.2d 1055 (N.D.Iowa 1999), the defendants, a city and it's former police chief, have now moved for summary judgment on all of the plaintiff's claims. Those claims include federal equal protection, due process, and sex discrimination claims, as well as state-law claims of gender discrimination, slander, and wrongful discharge, which were re-cently consolidated into this action. The probationary officer's claims are premised upon her assertions that the police chief discharged her for having a consensual, extra-marital relationship with a police captain, then made allegedly defamatory comments to a newspaper about her qualifications to be a police officer. Although the court found no "insuperable bar" on the face of the pleadings to the probationary officer's federal civil rights claims, the court must now consider whether summary judgment in the defendants' favor is appropriate on any of the plaintiff's claims,

state or federal, upon a more complete record.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Teresa A. Mercer filed her original complaint in this action on December 2, 1998, following her termination on March 13, 1998, from her position as a probationary police officer with the Police Department of the City of Cedar Rapids, Iowa. Mercer named as defendants the City of Cedar Rapids (the City), and William J. Byrne (Chief Byrne), who was the Chief of Police for the City at the time Mercer was terminated. The defendants moved to dismiss the original complaint, but Senior Judge McManus determined that the motion to dismiss was mooted when Mercer filed a First Amended Complaint, which articulated somewhat more clearly Mercer's claims of sexual discrimination, in violation of Title VII, 42 U.S.C. § 2000e–2, and claims of denial of constitutional rights to equal protection and due process, pursuant to 42 U.S.C. § 1983. The defendants renewed their motion to dismiss as to Mercer's First Amended Complaint on April 12, 1999, but this court denied the renewed motion on the merits on December 6, 1999.

Thereafter, on January 27, 2000, Mercer sought leave to amend her complaint to consolidate in a single action her federal claims and three state-law claims previously asserted in a parallel action in state court. Such leave was granted, and Mercer's Second Amended Complaint was filed, on February 1, 2000. In her Second Amended Complaint, Mercer once again alleges that Chief Byrne made the decision to terminate her, and in so doing, was acting as an agent with the full authorization of the City. See Second Amended Complaint, ¶ 6. Mercer's Complaint now alleges the following five claims arising from Mercer's termination or the circumstances surrounding it: Count I, pursuant to 42 U.S.C. § 1983, alleges a violation of Mercer's civil rights in the form of denial of her federal constitutional rights to equal protection and due process; Count II alleges "a violation" of Title VII, presumably sex discrimination;[1] Count III alleges slander based on statements Chief Byrne purportedly made to a reporter for a local newspaper at the time of Mercer's termination; Count IV alleges wrongful discharge in violation of Iowa public policy; and Count V alleges Mercer's termination was "on account of Plaintiff's gender" in violation of the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216.

On April 14, 2000, the defendants moved for summary judgment on all of Mercer's claims on various grounds. Mercer resisted the defendants' motion on May 9, 2000, and subsequently filed an amendment and addendum to her Statement of Additional Facts in resistance to the defendants' motion for summary judgment on May 30, 2000. The defendants filed a reply to the amended statement of facts on June 5, 2000. No party has requested oral arguments on the motion for summary judgment; therefore, the court finds that the motion for summary judgment is now fully submitted on the record and written arguments. The court will consider the defendants' grounds for summary judgment *seriatim* below. However, the court will

---

1. The Second Amended Complaint does not expressly allege "sex discrimination." Instead, in the portion of the Second Amended Complaint denominated "Counts I and II—Federal Civil Rights," after Mercer articulates the circumstances allegedly establishing violations of her constitutional rights to equal protection and due process, Mercer alleges that "Defendants' termination of Plaintiff was also a violation of 42 U.S.C. § 2000e–2." Second Amended Complaint, Counts I and II, ¶ 9. The parties, in their briefing of the previous motion to dismiss and the present motion for summary judgment, and the court, in its ruling on the motion to dismiss, characterized the Title VII claim as a "sex discrimination" claim without objection from the plaintiff. Moreover, nothing in the record identifies any other protected characteristic of Mercer upon which "a violation of 42 U.S.C. § 2000e–2" could be based.

first provide a brief statement of the factual background for Mercer's claims.

### B. Factual Background

The court will discuss here only the nucleus of undisputed facts and such of the disputed facts as are necessary to provide a factual background for the legal analysis of the defendants' motion for summary judgment, rather than attempting to provide an exhaustive dissertation of the undisputed and disputed facts in this case. In its legal analysis, the court will address in greater detail, where necessary, Mercer's assertions of genuine issues of material fact that may preclude summary judgment in the defendants' favor.

Unfortunately, the parties agree on very few facts. They agree that Mercer was hired as a probationary police officer by the City on March 17, 1997, and that her probationary period was for one year. They also agree that Mercer was terminated on March 13, 1998, before the end of her probationary period. Although the parties agree that defendant Byrne was the Chief of Police for the City during Mercer's employment as a Cedar Rapids Police Officer, they disagree on the definition of his duties and the extent of his policy- and decision-making authority regarding personnel matters. The parties also agree that Mercer's husband, now ex-husband, Shawn Mercer, was a Reserve Officer with the Cedar Rapids Police Department.

The parties agree that on at least two occasions, Chief Byrne received information suggesting that Mercer was or might be involved in a relationship with Captain Peters, the head of the Special Response Team of the Cedar Rapids Police Department, although both Captain Peters and Mercer were married to other people. Captain Peters taught at the Cedar Rapids Police Academy and Mercer had been one of his students when she was a Recruit Officer. Several of Mercer's Field Training Officers were members of the Special Response Team commanded by Captain Peters.

The occasions on which a possible relationship between Mercer and Peters came to Chief Byrne's attention apparently occurred two or three weeks apart in September or October of 1997. On both occasions, Chief Byrne received information that Mercer and Peters had been together at a local tavern. Mercer asserts that three of her Police Academy classmates were also with her at the tavern on the first occasion and that her presence in the same tavern with Captain Peters on both occasions was a coincidence, not a result of prearrangement between the two. She also asserts that it was not uncommon for Captain Peters to be at a drinking establishment with probationary officers and that Chief Byrne had never previously questioned him about such incidents. However, the parties agree that on the first of the occasions that came to Chief Byrne's attention, Chief Byrne questioned both Mercer and Peters separately about the incident. The parties disagree about the nature of Chief Byrne's concerns and the content of the conversations. The defendants contend that, in the course of her conversation with Chief Byrne, Mercer acknowledged that Chief Byrne had reason to be concerned about Mercer's behavior in being seen with Captain Peters, but Mercer asserts that she understood that Chief Byrne was concerned about drinking, not about her being at a tavern at the same time as Captain Peters. A second conversation between Byrne and Mercer occurred after Mercer and Peters were again seen together at the same tavern. At that time, the parties agree that Mercer informed Chief Byrne that she and her husband were having marital problems. Although the defendants contend that Chief Byrne never expressed an unfavorable view of any relationship between Mercer and Peters, Mercer contends that he did so on more than one occasion each to Mercer and Peters.

In November of 1997, someone slashed a tire on Captain Peters's car while it was in the parking lot of the Cedar Rapids Police Department. Captain Peters reported the

incident, but did not identify a suspect, although he apparently suspected Shawn Mercer of causing the damage. Mercer contends that she did not think Shawn was responsible for slashing the car tire until he was involved in two other violent incidents. However, the defendants contend that Mercer gave inconsistent statements to Internal Affairs officers about when she suspected Shawn of slashing the tire and whether she had ever told Shawn she thought he was a suspect or thought that Internal Affairs officers considered him a suspect.

Although the parties' statements of the facts are less than clear on these matters, police reports to which the parties refer indicate that Mercer reported to the Marion Police Department two other violent incidents involving Shawn Mercer at the trailer in Marion, Iowa, where the couple and their daughter, and later just Teresa Mercer and her daughter, were living. On December 7, 1997, Mercer reported to Marion Police an incident of alleged "criminal mischief" by Shawn Mercer, which involved vandalism to the couple's trailer. Then, on January 8, 1998, Mercer reported that on January 7, 1998, at about 1:00 a.m., Shawn Mercer had broken into the trailer, even though he was no longer living there and no longer had a key. The report indicated that Shawn was intoxicated and that a physical confrontation between Shawn and Mercer occurred. The parties agree that Mercer physically removed her husband from the trailer. Mercer contends that Shawn entered her trailer with the purpose of taking the couple's young child away from her. The parties agree that, during this incident, Captain Peters was also at the trailer, although it is unclear whether Shawn knew that at the time, and it does not appear that Captain Peters took any part in the physical confrontation between Mercer and her husband. Mercer contends that she was afraid that Shawn was armed with his service weapon when she discovered him in the trailer. Mercer and Peters both had their service weapons at the trailer, although they state that they did not have

those weapons on their persons at any time during Shawn's intrusion. Shawn had apparently been drinking heavily prior to the intrusion and Mercer and Peters state that they had also consumed alcoholic beverages that night. The parties agree that the situation at the trailer on January 7, 1998, was "volatile" and that Mercer recognized the danger at the time. Mercer contends that she delayed reporting this incident to the Marion police, because she was afraid it would prompt an investigation by the Internal Affairs Unit of the Cedar Rapids Police Department.

At some point, the parties agree that Internal Affairs officers did indeed begin an investigation of these incidents, but the parties disagree strenuously about the impetus for and timing of that investigation. The defendants contend that the Internal Affairs investigation began after Internal Affairs officers were contacted by the Marion Police Department about the "criminal mischief" incident at the Mercers' trailer, because Marion police recognized that the incident involved a police officer and reserve officer of the Cedar Rapids Police Department. Mercer contends that Internal Affairs officers first contacted the Marion Police Department for information about the incidents, before Mercer had even reported the "intrusion" incident, and that the Internal Affairs investigation of these incidents was a pretext for an investigation of the relationship between Mercer and Peters. The parties agree that the Internal Affairs investigator questioned Mercer and Peters about their relationship, but the parties disagree about the reason for the investigator's questions on this subject. Mercer contends that those questions were the real purpose of the Internal Affairs investigation, but the defendants contend that the purpose was to determine whether Mercer had been coerced into an unwanted relationship by a superior officer. Mercer told the Internal Affairs investigator that she was romantically involved with Peters, although Peters apparently denied that the nature of their relationship was romantic.

Mercer was ordered to keep matters discussed during the Internal Affairs investigation confidential and not to discuss them with anyone but legal counsel. However, she and Peters had a meeting with Nancy Evans, the Commissioner of Public Safety, on or about January 8, 1998. Evans was an elected official and one of Chief Byrne's superiors. At the meeting with Evans, Peters complained about Chief Byrne's conduct, although Mercer contends that she only stated that she had never felt sexually harassed until she was questioned by Internal Affairs officers about her relationship with Peters.

The defendants contend that supervising officers reported that the relationship between Mercer and Peters was causing disruption and morale problems on their shifts, but Mercer denies that any disruption of the Cedar Rapids Police Department occurred as a result of any relationship between the two. Nevertheless, following the January 7, 1998, altercation at the trailer, Chief Byrne asked both Shawn and Teresa Mercer to appear before the Functional Management Team, which is comprised of Assistant Chiefs of the Cedar Rapids Police Department, who assist the Chief in gathering facts and evaluating personnel matters. Mercer contends that she was the first department employee ever subjected to review by the Functional Management Team and that, prior to the "criminal mischief" and "intrusion" incidents, her performance evaluations had been good. Following the meeting of the Functional Management Team, all three of the Assistant Chiefs recommended that Shawn Mercer be dismissed from the reserve unit, and two recommended that Teresa Mercer also be discharged from her probationary employment, while the third Assistant Chief was undecided.

Based on the recommendation of the Functional Management Team, Chief Byrne decided to give Teresa Mercer an administrative hearing. Chief Byrne gave Mercer written notice that such a hearing was scheduled for March 10, 1998, and that she could appear with counsel to present information. Mercer appeared for the hearing with counsel and presented information on her behalf. However, on March 13, 1998, Chief Byrne notified Mercer by letter that she was "released from probation effective immediately." Defendants' Attachments To Statement Of Undisputed Material Facts, Exhibit E. The letter also stated, "It is my determination that you do not meet the standards required of a police officer on the Cedar Rapids Police Department." *Id.* Shawn Mercer was also removed as a Reserve Police Officer on March 12, 1998, after an Internal Review Board Meeting on February 23, 1998. Captain Peters was not discharged, although he was reassigned to different duties.

On March 14, 1998, an article with the headline "Officer loses job; had relationship with co-worker" appeared in THE CEDAR RAPIDS GAZETTE concerning Teresa Mercer's discharge. The article stated, in pertinent part, as follows:

> Veteran Cedar Rapids police Capt. Phil Peters got a lateral reassignment in January from the command job he loved.

> On Friday, the probationary female officer with whom he had an off-duty relationship that attracted the police chief's concern lost her job.

> Police Chief Bud Byrne last night downplayed officer Teresa Mercer's dismissal, saying it is not uncommon for a member of the probationary class to lose the job in the year before a permanent assignment begins.

> The probationary year, which for Mercer was to have ended in a few days, gives the department and the officer a chance to see if police work is right for the officer, Byrne said.

> "And so it's not an unusual thing to find people who just don't meet up," Byrne said.

> \* \* \* \* \* \*

Byrne has not publicly detailed what he objected to about the relationship between Peters and Mercer other than to say any off-duty relationship that "adversely affects the workplace has to be addressed."

Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1. By letter from her counsel, Mercer informed Chief Byrne that she believed that certain of the statements attributed to him in the newspaper article were untrue and defamatory and she demanded a retraction of those statements. Plaintiff's Reply to Statement Of Undisputed Material Facts And Statement Of Additional Facts, Exhibit 3, p. 1. However, Mercer has not received any response to that letter.

Following her discharge from the Cedar Rapids Police Department, Mercer was unable to find employment as a police officer with any other law enforcement agency until some time in May of 2000.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here.

Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484,

1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the defendants' motion for summary judgment on Mercer's federal and state-law claims.

### B. Constitutional Claims

Mercer's constitutional claims, pursuant to 42 U.S.C. § 1983, in Count I of her Second Amended Complaint, are alleged as follows:

7. Defendants' termination of Plaintiff was based in part on consideration of Plaintiff's gender in that others who had committed the same acts as alleged to be the basis for Plaintiff's termination were not terminated or similarly disciplined.

8. Defendants were acting under color of State law when they terminated Plaintiff, which act constituted the deprivation of Plaintiff's civil rights actionable under 42 U.S.C. § 1983, in the following particulars:

> a) Plaintiff's termination resulted from her involvement in a relationship with another officer when both Plaintiff and that other officer were married. Plaintiff was subjected to a trumped up internal affairs investigation involving repeated inquiries into matters of a personal nature, and was fired as a consequence of her participation in the relationship, while the other party to the relationship was not terminated. Plaintiff was thereby denied equal protection under the law in that she was discriminated against on the basis of her gender.
>
> b) At the time of Plaintiff's termination, Defendant Byrne made statements to the media which stigmatized Plaintiff as a person incapable of performing the duties of a

police officer. Plaintiff was offered no opportunity in a public hearing to rebut those stigmatizing statements, and was thus deprived of a constitutionally protected occupational liberty interest without due process of law.

Second Amended Complaint, Counts I and II, at ¶¶ 7–8. Thus, Mercer expressly asserts both an equal protection claim and a due process claim arising from her termination in a single count alleging violations of her civil rights. Moreover, according to the allegations of the Second Amended Complaint, the two claims are asserted on the basis of distinct factual circumstances, although both are related to Mercer's termination: Mercer's equal protection claim is based on her allegedly disparate treatment from a similarly situated male, Captain Peters, who was not discharged for his involvement in their relationship, whereas she was, *see id.* at ¶ 8(a), while Mercer's due process claim is based on allegedly stigmatizing statements by Chief Byrne at the time of her discharge. *See id.* at ¶ 8(b).

The defendants contend that they are entitled to summary judgment on both of Mercer's constitutional claims. The court will consider separately the defendants' grounds for summary judgment on these two claims.

### 1. Mercer's equal protection claim

### a. Elements of the claim

In its ruling on the defendants' motion to dismiss, this court explained,

> To prove an equal protection claim, a public employee must show (1) that he or she was singled out and treated differently from persons similarly situated, and (2) that the plaintiff was singled out on the basis of a prohibited characteristic, such as gender. *See Ellebracht v. Police Bd. of Metro. Police Dep't of St. Louis,* 137 F.3d 563, 566 (8th Cir.1998). Therefore, this court concludes that a public employee sufficiently alleges dis-

criminatory discharge in violation of equal protection rights where the employee alleges that he or she was singled out for termination on the basis of gender, while employees of the opposite gender guilty of the same conduct upon which termination was purportedly based were not terminated. *Cf. Backlund v. Hessen*, 104 F.3d 1031, 1032 (8th Cir.1997) (allegations that a fire department discriminated against the plaintiff in violation of the equal protection clause, because he was not related to any present or past fire department employees, was sufficient to state a claim).

*Mercer*, 79 F.Supp.2d at 1062–63.

This court has elsewhere explained that, "[a]bsent a threshold showing that [the plaintiff] is similarly situated to those who allegedly received favorable treatment, the plaintiff does not have a viable equal protection claim." *Mummelthie v. City of Mason City, Iowa*, 873 F.Supp. 1293, 1333 (N.D.Iowa 1995) (citing *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir.1994), *cert. denied*, 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995)), *aff'd*, 78 F.3d 589 (8th Cir.1996) (table op.); *accord Arnold v. City of Columbia, Mo.*, 197 F.3d 1217, 1220 (8th Cir.1999) ("To prove their equal protection claim [based on disparate pay], appellant [police officers] were required, as a threshold matter, to demonstrate that they were treated differently from others *similarly situated* to them.") (emphasis in the original); *Roark v. City of Hazen, Ark.*, 189 F.3d 758, 761 (8th Cir.1999) (a city police chief's equal protection claim failed, because he presented no evidence showing that he was treated in a manner different from that accorded other similarly situated individuals). "[D]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Id.; accord Arnold*, 197 F.3d at 1221 (" 'Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause.' ") (quoting *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir.1996)).

Although this court concluded that Mercer adequately *pleaded* the elements of her equal protection claim, in denying the defendants' motion to dismiss this claim, the critical issue on the defendants' motion for summary judgment is whether there is a genuine issue of material fact in the record as a whole on the threshold question of whether Mercer was actually subjected to different treatment, on the basis of her gender, than any "similarly situated" male. *See* FED. R. CIV. P. 56(c); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same).

### b. Were Mercer and Peters "similarly situated"?

The defendants contend that Mercer was not treated differently on the basis of gender than any other person to whom she was similarly situated. The defendants contend that the difference in rank between Captain Peters and Probationary Officer Mercer means that they were not similarly situated and that it was on the basis of their difference in rank, not gender, that the two officers involved in the relationship were treated differently, if indeed their relationship was the impetus for Mercer's discharge, which the defendants deny. The defendants point out that Mercer and her husband were similarly situated, as both were engaged in the altercation at the trailer, which the defendants contend was the real reason for disciplinary action, and both were terminated.

Mercer contends that her equal protection claim must survive the defendants' motion for summary judgment, because she is similarly situated to Captain Peters, their differences in rank notwithstanding, because she and Captain Peters were both accused of the same conduct, which she alleges was their extra-marital relationship, but they were disciplined in different

ways. Mercer also contends that the defendants' argument for dissimilarity based on rank fails with the defendants' concession that Mercer and her husband, a Probationary Officer and a Reserve Officer, respectively, were both terminated for the same purported misconduct, despite the difference in their ranks.

*i. The defendants' difference based on "rank."* The defendants contend that *Post v. Harper,* 980 F.2d 491 (8th Cir. 1992), is "[o]f particular significance" to their argument that the difference in "rank" between Mercer and Peters demonstrates that they were not "similarly situated." Defendants' Brief In Support Of Motion For Summary Judgment at 5. In *Post,* the court found that a county employee was not similarly situated to elected public officials, and therefore his equal protection claim, which was founded on his disparate treatment from such officials, failed. *See Post,* 980 F.2d at 495. However, this court does not read *Post* to stand for so broad a proposition as a rule that police officers of different *rank* are not "similarly situated," at least not in circumstances where neither officer was an elected official.

Nevertheless, the *Post* decision is instructive, because it does explain that "the essence of equal protection analysis [is that] similarly situated people must receive similar treatment under the law," and where the persons identified for comparison are "not similarly situated, either in fact or in contemplation of law," the plaintiff's disparate treatment claim cannot be sustained. *Id.* (concluding that, "[a]s a county employee, Post is not similarly situated, either in fact or in contemplation of law, to elected public officials or to municipal employees"). Although the plaintiff in *Post* argued "that the differences in the legal protection afforded to county employees, as distinguished from those afforded to county officials or municipal employees, are not rationally related to legitimate governmental interest," the court found "[h]is arguments are unpersuasive and do not warrant extended discussion." *Id.* Thus, *Post* indicates that differences in the degree of legal protection afforded the persons identified as similarly situated are not only relevant to the "similarly situated" analysis, but may be outcome determinative, unless such differences are not rationally related to a legitimate governmental interest.

*ii. The plaintiff's "accusation of the same conduct" test.* Mercer contends, however, that "[e]mployees are similarly situated when they are involved in or accused of the same or similar conduct and are disciplined in different ways," citing *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1309 (8th Cir.1994), and *Wallin v. Minnesota Dep't of Corrections,* 153 F.3d 681, 687 (8th Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). Mercer apparently asserts that this "accusation of the same conduct" test is the sole test of whether employees are "similarly situated." The court does not agree.

Neither of the cases Mercer cites supports the exclusivity of the "accusation of the same conduct" test. The court acknowledges that *Wallin,* an ADA case, does indeed state the general proposition on which Mercer relies. *See Wallin,* 153 F.3d at 687 ("Employees are similarly situated when they 'are involved in or accused of the same or similar conduct and are disciplined in different ways.' ") (quoting *Williams,* 14 F.3d at 1309). However, in *Wallin,* the court held that the plaintiff was not similarly situated to the other employees he cited for comparison, "because their misconduct was not as egregious as Wallin's." *Id.* Thus, the *Wallin* decision can be read as relying on only one prong of the test as stated in *Post,* that the other employees were not similarly situated "in fact," which obviated the need to reach the question of whether the employees were similarly situated "in contemplation of law," the other prong of the test as stated in *Post. See Post,* 980 F.2d at 495.

Similarly, in *Williams,* a Title VII race discrimination case on which both Mercer and the *Wallin* decision rely, the court

acknowledged that " *'for purposes of establishing a prima facie case* [the court] consider[s] whether the employees are involved in or accused of the same or similar conduct and disciplined in different ways.'" *See Williams,* 14 F.3d at 1309 (emphasis added) (quoting *Boner v. Board of Comm'rs,* 674 F.2d 693, 697 (8th Cir. 1982)). However, when the court found that the *prima facie* case had been rebutted by the employer's articulation of a legitimate, non-discriminatory reason for its decision to treat the plaintiff differently from other employees disciplined for the same rule infraction, the court found that the plaintiff and the other employees were not " 'similarly situated in all relevant respects.' " *See id.* (quoting *Smith v. Monsanto Chem. Co.,* 770 F.2d 719, 723 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986), in turn quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Instead, the court recited a laundry list of factual differences between the plaintiff and the employees with whom he compared himself to demonstrate that the plaintiff and the other employees were not "similarly situated in all relevant respects." *Id.* at 1309–10. Thus, the question of whether the employees were "similarly situated" in *Williams* was also ultimately settled on the basis of relevant factual differences—apart from whether the employees were accused of the same conduct—without recourse to the "in contemplation of law" prong of the analysis articulated in *Post.*

This court does not read either *Wallin* or *Williams,* or any of the other decisions reciting that "employees are similarly situated when they are involved in or accused of the same or similar conduct and are disciplined in different ways," to stand for the proposition that the *exclusive* test of whether persons are similarly situated is whether they have been accused of the same conduct, but treated differently. *See, e.g., Ward v. Procter & Gamble Paper Prods. Co.,* 111 F.3d 558, 560 (8th Cir.1997) (noting, in a Title VII race discrimination case, that "[e]mployees are similarly situ-

ated when they are involved in or accused of the *same offense* and are disciplined in different ways") (emphasis in the original; citations and internal quotation marks omitted); *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994) (stating, in a Title VII race discrimination case, that "[e]mployees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways") (citations and internal quotation marks omitted). Although this factual test may be dispositive of the question of whether the plaintiff has stated a *prima facie* case of disparate treatment, at least in the absence of evidence that the employees are not similarly situated "in contemplation of law," *see Williams,* 14 F.3d at 1309 (employing this factual test of whether employees were "similarly situated" to determine whether the plaintiff had established a *prima facie* case of disparate treatment), or even dispositive of the plaintiff's disparate treatment claim when factual differences in the plaintiff's conduct as compared to other employees demonstrate that the employees are *not* "similarly situated," *see Wallin,* 153 F.3d at 687; *Ward,* 111 F.3d at 560 (finding that the plaintiff and another employee "were not similarly situated because their offenses were quite different"); *Harvey,* 38 F.3d at 972 (finding the situation of other employees accused of various types of misconduct was factually dissimilar from the misconduct of the plaintiff, a security supervisor, in ignoring a life-threatening situation), these effects do not make "accusation of the same conduct" the *only* test for determining whether identified employees are "similarly situated" to the plaintiff.

■ *iii. The proper test.* Rather, as *Williams* specifically states, the proper formulation of the test of whether identified employees are "similarly situated" is whether the employees are "similarly situated *in all relevant respects.*" *See Williams,* 14 F.3d at 1309 (emphasis added). Other decisions of the Eighth Circuit Court of Appeals also make clear that the

employees identified for comparison must be "similarly situated in all relevant respects," not simply in terms of whether they were accused of the same conduct. *See Lynn v. Deaconess Med. Center–West Campus*, 160 F.3d 484, 487 (8th Cir.1998) (the plaintiff asserting disparate treatment "has the burden of proving that he and the disparately treated [co-employees] were 'similarly situated in all relevant respects' ") (quoting *Harvey*, 38 F.3d at 972); *Ward*, 111 F.3d at 560; *Harvey*, 38 F.3d at 972.

Indeed, in *Lynn*, a panel of the Eighth Circuit Court of Appeals specifically rejected the contention that the exclusive test of whether employees are similarly situated is whether they are accused of "the same or similar conduct," noting that other facts may also provide the relevant respects in which the parties are "similarly situated." *See Lynn*, 160 F.3d at 488 (rejecting the contention that "employees are similarly situated *only* when they engage in the *same* offense") (emphasis in the original). The court found that the exclusivity of the "accusation of the same conduct" test could not be drawn from *Ward*, 111 F.3d 558, upon which the defendant and the district court had relied, because in *Ward*, the court had first stated the test in terms of whether the plaintiff could prove that she and the other employees were " 'similarly situated in all relevant respects.' " *Lynn*, 160 F.3d at 488 n. 5 (quoting *Ward*, 111 F.3d at 560). Moreover, the court in *Lynn* found that the *Ward* decision explained that courts must look beyond labels attached to misconduct to determine whether there are levels of misconduct within the same "label." *Id.* (citing *Ward*, 111 F.3d at 561).

The court in *Lynn* concluded that "accusation of the same conduct" was not even the proper formulation of the question of factual similarity; rather, the proper question was whether the employees engaged in conduct "of 'comparable seriousness.' " *Id.* at 488 (quoting *Ricks v. Riverwood Int'l Corp.*, 38 F.3d 1016, 1019 (8th Cir. 1994), and also citing *McAlester v. United*

*Air Lines, Inc.*, 851 F.2d 1249, 1261 (10th Cir.1988)). The court explained,

> To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination. Common sense as well as our case law dictate that we reject such an approach.

*Lynn*, 160 F.3d at 488. The court concluded that another employee's "sleeping on the job was at least comparable to, if not more serious than, the misconduct alleged against [the plaintiff]," and therefore, "[u]nder the circumstances, we find that [the two employees] were similarly situated." *Id.*

Thus, the Eighth Circuit Court of Appeals expressly recognized in *Lynn* that whether employees are "similarly situated in all relevant respects" extends beyond the factual identity or similarity of the conduct of which they are accused. As this court explained above, the *Post* decision recognizes further that conduct is not the only "relevant respect" for comparison of employees, because "relevant respects" necessarily include consideration of whether employees are "similarly situated" both "in fact" and "in contemplation of law." *See Post*, 980 F.2d at 495.

█ *iv. "Probationary" versus "permanent" status.* Recognizing that the employees under comparison must be "similarly situated in all relevant respects," including "in contemplation of law," the court turns to the question of whether probationary employees are so different "in contemplation of law" from permanent employees that they are not, as a matter of law, "similarly situated." The court acknowledges that the defendants' arguments for summary judgment on Mercer's equal protection claim only inartfully raise the difference in legal status between Mercer, as a probationary em-

ployee, and Peters, as a permanent employee, because the defendants instead referred primarily to the difference in *rank* between Mercer and Peters. Nevertheless, the defendants have frequently pointed out that Mercer was only a probationary officer, while Peters was a permanent employee, with fifteen years of experience, occupying a supervisory position, and holding a civil service rank of police captain. Furthermore, in their argument for Chief Byrne's qualified immunity, the defendants specifically assert,

> Teresa Mercer and Captain Peters were not similarly situated, factually *or legally* [,] within the Police Department. In this regard, see generally Iowa Code Section 408(3)[sic] requiring a twelve month probationary period for newly hired police officers and consequent lack of civil service or other employment protection.

Defendants' Brief In Support Of Motion For Summary Judgment at 10 (emphasis added). These assertions, the court concludes, are sufficient to put at issue whether Mercer and Peters were "similarly situated" "in contemplation of law" on the basis of her probationary employment status versus his permanent employment status.

Decisions of the Eighth Circuit Court of Appeals are instructive on the question of whether probationary and permanent employees are "similarly situated." For example, in *Ghane v. West*, 148 F.3d 979 (8th Cir.1998), a case involving race and national origin discrimination claims pursuant to Title VII, the court held that the plaintiff's probationary status meant that he was not similarly situated, as a matter of law, to permanent employees with whom he compared himself:

> In support of his pretext argument on appeal, Ghane argues that other non-Iranian employees were also late in completing work assignments and sometimes required substantial revisions of their written work. Brief for Appellant at 15. *In response, however, appellee argues, that those employees were not similarly situated to Ghane in that they* were not probationary employees and their work deficiencies did not rise to the level of Ghane's. Brief for Appellee at 16 (citing Appellant's Appendix at 59 (affidavit of Richard T. Medary)). Having carefully reviewed the record, *we conclude that Ghane's disparate treatment argument is insufficient as a matter of law* to support a reasonable inference that appellee's proffered reasons are pretexts for intentional discrimination based on race or national origin *because Ghane has not demonstrated that those individuals to whom he compares himself are similarly situated in all relevant respects.* See, e.g., *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994) (instances of disparate treatment can support claim of pretext, but the plaintiff has the burden to show that he or she is similarly situated in all relevant respects to the individuals who were treated more favorably).

*Ghane*, 148 F.3d at 982 (emphasis added).

Similarly, in *Herr v. Airborne Freight Corp.*, 130 F.3d 359 (8th Cir.1997), a Title VII sex discrimination case, the court observed,

> Herr cannot meet her burden of proving that she was similarly situated to these male employees in all relevant respects. *See Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994). *Herr's poor performance occurred when she was a probationary driver, unprotected by the collective bargaining agreement and its discipline process that governed permanent drivers.* Moreover, there is no reason for Airborne to issue discipline letters to casual drivers because its recourse for a casual driver's poor performance is not to give that driver more work. *Thus, Herr was not similarly situated to male permanent drivers regarding disciplinary procedures.*

*Herr*, 130 F.3d at 362 (emphasis added); *see also Kramer v. Logan County Sch. Dist. No. R–1*, 157 F.3d 620, 628 (8th Cir.1998) (Hansen, J., dissenting) ("Needless to say, tenured teachers are not simi-

larly situated to probationary teachers," citing NEB. REV. STAT. §§ 79–828(4) & 79–829 (1996)).

Decisions of other courts are in agreement. *See, e.g., Holbrook v. Reno,* 196 F.3d 255, 262 (D.C.Cir.1999) ("We cannot see how Holbrook, a probationary trainee [with the FBI], could possibly be similarly situated to a fifteen-year veteran with supervisory responsibilities," noting that in *McKenna, infra,* the court had held that a probationary employee was not similarly situated to a permanent employee, when agency regulations mandated termination of probationary employees with performance problems, even if such problems would not have been good cause to terminate a permanent employee); *McKenna v. Weinberger,* 729 F.2d 783, 789 (D.C.Cir. 1984) (a female probationary employee was not similarly situated to male permanent employees); *Walker v. Runyon,* 979 F.Supp. 1363, 1368 (D.Kan.1997) (a black probationary employee was not similarly situated to a white employee who was never on probation during plaintiff's tenure); *Williams v. Cuomo,* 961 F.Supp. 1241, 1245 (N.D.Ill.1997) (where a black male was the only probationary employee, there were no similarly situated employees), *aff'd,* 151 F.3d 1035 (7th Cir.1998), *cert. denied,* 525 U.S. 1160, 119 S.Ct. 1070, 143 L.Ed.2d 74 (1999).

**v. The difference in legal status here.** The pertinent statutory provision regarding Mercer's and Peters's employment status is IOWA CODE § 400.8(3), which, at the time of Mercer's employment, stated the following:

3. *All appointments to such [civil service] positions [with cities with the requisite population, as stated in § 400.6] shall be conditional upon a probation period of not to exceed six months, and in the case of police patrol officers, police dispatchers, and fire fighters a probation period not to exceed twelve months.* However, in cities with

a population over one hundred seventy-five thousand, appointments to the position of fire fighter shall be conditional upon a probation period of not to exceed twenty-four months. *During the probation period, the appointee may be removed or discharged from such position by the appointing person or body without the right of appeal to the commission.* A person removed or discharged during a probationary period shall, at the time of discharge, be given a notice in writing stating the reason or reasons for the dismissal. A copy of such notice shall be promptly filed with the commission. *Continuance in the position after the expiration of such probationary period shall constitute a permanent appointment.*

IOWA CODE § 400.8(3) (1999) (emphasis added).[2] By establishing Mercer's initial employment status as probationary, and permitting her discharge during the probationary period "without the right to appeal to the commission," and distinguishing that status from permanent employment enjoyed by Captain Peters, this provision establishes a relevant legal distinction between Mercer's and Captain Peters's employment statuses, and thus establishes that they are not "similarly situated . . . in contemplation of law." *See Post,* 980 F.2d at 495 (the persons identified for comparison must be "similarly situated" both "in fact" and "in contemplation of law"). A conclusion that the differences in the legal protection under Iowa's civil service statute afforded permanent employees, as distinguished from probationary employees, particularly in law enforcement positions, are "rationally related to legitimate governmental interest," as in *Post,* "do[es] not warrant extended discussion." *Id.*

Thus, Mercer, a probationary employee, was not, as a matter of law, similarly situated to Captain Peters, a permanent officer. *See Ghane,* 148 F.3d at 982; *Herr,*

---

**2.** This provision was amended in 1998 to provide for a maximum probationary period of nine months for police officers who have

graduated from a certified Iowa law enforcement academy. IOWA CODE § 400.8(3) (1999).

130 F.3d at 362; *accord Holbrook,* 196 F.3d at 262 ("We cannot see how Holbrook, a probationary trainee [with the FBI], could possibly be similarly situated to a fifteen-year veteran with supervisory responsibilities"). They were not similarly situated "in all relevant respects," *see Lynn,* 160 F.3d at 487; *Ghane,* 148 F.3d at 982; *Herr,* 130 F.3d at 362; *Ward,* 111 F.3d at 560; *Harvey,* 38 F.3d at 972; *Williams,* 14 F.3d at 1309, that is, they were not similarly situated "in contemplation of law." *Post,* 980 F.2d at 495.

In these circumstances, the defendants are entitled to summary judgment on Mercer's equal protection claim as a matter of law, because Mercer cannot establish a threshold element of that claim. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

### 2. Mercer's due process claim

The court turns next to the defendants' motion for summary judgment on the second of Mercer's constitutional claims, her due process claim. In their motion for summary judgment, the defendants contend that the record demonstrates that there was no impingement upon Mercer's protected liberty interest in her employment—an essential prerequisite to her due process claim—because no sufficient "stigma" was attached to her by Chief Byrne's comments on her ability to "meet up" with the standards for a police officer. The defendants also contend that Mercer waived any right to a post-termination "name-clearing" hearing, because, although Chief Byrne advised Mercer that she could request a public hearing in the letter informing her of her termination, Mercer has never requested such a hearing. The defendants contend further that such a hearing, rather than money damages or reinstatement, is the only remedy available for the due process violation alleged.

Mercer contends that Chief Byrne's comments did have a sufficiently stigmatizing effect, as she had been foreclosed (at the time her brief was filed) from obtaining any employment as a police officer after her dismissal. Mercer also contends, for the first time, that she is asserting a "substantive due process" claim, as well as a "procedural due process" claim. She contends that "stigma" is irrelevant to a "substantive due process" claim, as such a claim instead turns on the arbitrariness and capriciousness of the state actor's conduct. She contends that dismissal of the female participant in an affair, but not the male participant, is sufficiently arbitrary and capricious to sustain her claim.

In their reply to Mercer's amendment of her statement of facts, which withdrew the paragraph asserting that Mercer had been unable to find employment as a law enforcement officer as a result of Chief Byrne's comments upon her dismissal, the defendants contend that Mercer's entire due process claim "collapses." They contend that this is so, because Mercer has not been foreclosed from further employment, even assuming "foreclosure of employment" is the proper standard for determining the constitutional dimensions of "stigma" on Mercer's due process claim.

The court's analysis of these arguments begins with the question of whether Mercer has waived her "procedural" due process claim. Only if the court finds that Mercer has not waived the claim will it be necessary for the court to consider whether genuine issues of material fact on the essential element of "stigma" preclude summary judgment in the defendants' favor. Because there is no assertion that Mercer has "waived" her "substantive" due

process claim, the court will also give separate consideration to that claim.

### a. Waiver of the "procedural" due process claim

The defendants contend that Mercer has waived any right to a post-termination "name-clearing" hearing, and hence has waived her "procedural" due process claim, because she has never requested a name-clearing hearing, even though Chief Byrne advised her that she could request a public hearing in the letter informing her of her termination. This contention fails upon examination of the record in light of the applicable law.

■ As explained in this court's ruling on the defendants' motion to dismiss, under the applicable law, a public employee's liberty interest, the basis for a due process claim, is impinged "when, in connection with the employee's discharge, a government official makes [public] accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities.'" *Mercer*, 79 F.Supp.2d at 1063 (quoting *Johnson*, 113 F.3d at 843); *see also id.* (citing *Johnson*, 113 F.3d at 844, and *Bell v. Sellevold*, 713 F.2d 1396, 1401 (8th Cir. 1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 978, 79 L.Ed.2d 215 (1984), for the requirement that the stigmatizing comments must be made to the public). " 'A public employee is [therefore] entitled to notice and a name-clearing hearing when fired under circumstances imposing a stigma on her professional reputation.'" *Id.* (quoting *Graning*, 172 F.3d at 616). Thus, the stigmatizing comments on which Mercer's due process claim depend are the *public* comments attributed to Chief Byrne in The Cedar Rapids Gazette concerning Mercer's discharge. *See generally Coleman v. Reed*, 147 F.3d 751, 755 (8th Cir.1998) (defining the elements of a public employee's due process claim based on loss of a protected liberty interest as follows: "First, she must show that the reason for her discharge stigmatized her[;][s]econd, she must show that the [defendants] made those reasons public[;][and][f]inally, [the

plaintiff] must establish that she denied the charges for which she was terminated.") (internal citations omitted); *see also id.* (limiting the comments relevant to the due process claim to "the only charges published in the statement approved by [the defendant]"); *Waddell v. Forney*, 108 F.3d 889, 896 (8th Cir.1997) (statements allegedly made during a private meeting could not be the basis for a due process claim).

■ Turning from the applicable law to the pertinent facts, it is true that, in the March 13, 1998, letter notifying Mercer of her termination, Chief Byrne offered Mercer the opportunity to request a hearing in a public forum concerning her discharge. *See* Defendants' Attachments To Statement Of Undisputed Material Facts, Exhibit E ("If you desire an opportunity to present information, evidence, or arguments at a public forum subsequent to your probationary release from employment, please contact my office and I will arrange such an opportunity."). It is also true that the termination letter stated grounds for termination that are similar to those Chief Byrne allegedly made public. *See id.* ("It is my determination that you do not meet the standards required of a police officer on the Cedar Rapids Police Department."), *and compare* Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1 (newspaper article dated March 14, 1998, quoting Chief Byrne as stating that Mercer did not "meet up" with the standards for police officers). However, the offer of a name-clearing hearing stated in the termination letter was made in reference to comments in a *private* communication, that is, in the termination letter to Mercer, *before any public comments on which a due process claim could be founded were made. See Coleman*, 147 F.3d at 755 (limiting the comments relevant to the due process claim to "the only charges published in the statement approved by [the defendant]"); *Waddell*, 108 F.3d at 896 (statements allegedly made during a pri-

vate meeting could not be the basis for a due process claim). The *public* comments that are allegedly sufficiently stigmatizing to sustain Mercer's due process claim were not made until March 14, 1998. *See* Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1 (newspaper article dated March 14, 1998). The record does not show that any name-clearing hearing was offered after or in regard to these *public* comments. Thus, the record discloses no offer of a name-clearing hearing in relation to the comments giving rise to Mercer's "procedural" due process claim, so that Mercer could not have "waived" such a claim by failing to take advantage of the offered hearing.

■ The record does, however, indicate that on March 17, 1998, Mercer asserted to Chief Byrne that his *public* comments were defamatory and that she demanded a retraction and redress, but she has never received any response from Chief Byrne. *See* Plaintiff's Reply to Statement Of Undisputed Material Facts And Statement Of Additional Facts, Exhibit 3 (letter from Mercer's counsel to Chief Byrne), p. 1 (asserting the public comments were untrue and defamatory and demanding a retraction) & p. 3 (demanding that Chief Byrne "restore [Mercer] to the dignity and honor which she held before the publication of your comments. . . ."). Although the letter did not contain an express demand for "a name-clearing hearing," it did contain a demand for restoration of Mercer's "dignity." *Id.* at p. 3. From these facts, the court concludes that Mercer adequately invoked the right to a name-clearing hearing. Moreover, the law places the onus upon the public employer to provide a name-clearing hearing when circumstances require; it does not appear to require the plaintiff to demand such a hearing. *See Mercer*, 79 F.Supp.2d at 1063.

Thus, the record does not demonstrate that Mercer has waived her "procedural" due process claim as a matter of law. The record instead demonstrates, beyond dispute, that Mercer affirmatively asserted a demand for redress of the "procedural" due process violation prior to filing suit, but received no response. In these circumstances, the defendants are not entitled to summary judgment on Mercer's "procedural" due process claim on the basis of their argument that Mercer has "waived" her "procedural" due process claim, because no such "waiver" has occurred as a matter of law. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted only where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

### b. Sufficiency of the "stigma" to sustain a "procedural" due process claim

In its ruling denying the defendants' motion to dismiss Mercer's due process claim, then understood to be only a "procedural" due process claim, this court explained the nature of such a claim as follows:

As the Eighth Circuit Court of Appeals recently explained, " 'To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.' " *Spitzmiller v. Hawkins*, 183 F.3d 912, 915 (8th Cir.1999) (quoting *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir.1999) (*per curiam*)); *accord Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Graning v. Sherburne County*, 172 F.3d 611, 616 (8th Cir.1999) ("A state employee is entitled to a hearing or some related form of due process before being deprived of a constitutionally protected property or liberty interest.") (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)); *Johnson v. City of West Memphis*, 113 F.3d 842, 843 (8th Cir.1997) ("The Due Process Clause requires the government to provide an employee with procedural due process if the employee stands to

lose a constitutionally protected property or liberty interest.") (also citing *Roth*, 408 U.S. at 569–70, 92 S.Ct. 2701).

"An employee's liberty interests are implicated when, in connection with the employee's discharge, a government official makes accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities." *Johnson*, 113 F.3d at 843. "A public employee is [therefore] entitled to notice and a name-clearing hearing when fired under circumstances imposing a stigma on her professional reputation." *Graning*, 172 F.3d at 616. However, no liberty interest is implicated if there are no public accusations that would "stigmatize" the employee. *See Johnson*, 113 F.3d at 844 (there had been no public accusations stigmatizing the employee, and hence no liberty interest was implicated, when the public comment of a councilwoman simply expressed her view that it was inappropriate for the utility commission to do construction work on private property).

The Eighth Circuit Court of Appeals acknowledged some time ago that there is "a line of public employee cases holding that a public body may not discharge anyone—even an employee without a contractual or property right in his job—and make public reasons for the discharge involving stigma or obloquy, without giving the employee a right to clear his or her name at some kind of a due-process hearing." *Bell v. Sellevold*, 713 F.2d 1396, 1401 (8th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 978, 79 L.Ed.2d 215 (1984). However, such a "liberty theory" fails if the "defendant never made public any stigmatizing reasons for [its] action." *See id.; accord Johnson*, 113 F.3d at 844 (no public accusations concerning the plaintiff's competence were made by the defendants).

*Mercer*, 79 F.Supp.2d at 1063. This court held that Mercer had adequately alleged stigmatizing comments to the press by Chief Byrne regarding her discharge and that such allegations had foreclosed her further employment, such that her complaint did state a due process claim. *Id.* at 1063–64.

However, the defendants now contend that they are entitled to summary judgment on Mercer's "procedural" due process claim, because the record demonstrates no sufficient "stigma" from Chief Byrne's public comments upon which such a claim can be founded. Because such "stigma" is an essential element of Mercer's "procedural" due process claim, *see Mercer*, 79 F.Supp.2d at 1063; *accord Coleman*, 147 F.3d at 755, the court must consider whether the record raises genuine issues of material fact that Mercer has suffered sufficient "stigma" to sustain her "procedural" due process claim. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same).

■ *i. Nature of the stigma or obloquy.* As this court explained in its prior ruling, the comments upon which a public employee's "procedural" due process claim is founded must be " 'accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities,' " *Mercer*, 79 F.Supp.2d at 1063 (quoting *Johnson*, 113 F.3d at 843), or, to put it another way, comments that involve " 'stigma or obloquy.' " *Id.* (quoting *Bell*, 713 F.2d at 1401); *accord Graning*, 172 F.3d at 616 ("A public employee is also entitled to notice and a name-clearing hearing when fired under circumstances imposing a stigma on her professional reputation."); *Cole-*

*man,* 147 F.3d at 755 (defining the first element of a due process claim as requiring the plaintiff to "show that the reason for her discharge stigmatized her"). Similarly, in a decision handed down since this court ruled on the defendants' motion to dismiss, the Eighth Circuit Court of Appeals stated that a public employee's protected liberty interest "is implicated when she is terminated amid charges that 'seriously damage [her] standing and associations in the community.'" *Buchholz v. Aldaya,* 210 F.3d 862, 866 (8th Cir.2000) (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. 2701). Thus, the question is, what comments inflict this kind of damage?

The Eighth Circuit Court of Appeals recently explained that "'[t]he requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like.'" *Buchholz,* 210 F.3d at 866 (quoting *Winegar v. Des Moines Indep. Community Sch. Dist.,* 20 F.3d 895, 899 (8th Cir.), *cert. denied,* 513 U.S. 964, 115 S.Ct. 426, 130 L.Ed.2d 340 (1994)); *Waddell,* 108 F.3d at 895–96 (identifying the same kind of comments, citing *Shands v. City of Kennett,* 993 F.2d 1337, 1347 (8th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994)). To put it another way, a liberty interest is infringed by "'a stigma of moral turpitude.'" *Raposa v. Meade Sch. Dist. 46–1,* 790 F.2d 1349, 1354 (8th Cir.1986) (quoting *Stretten v. Wadsworth Veterans Hosp.,* 537 F.2d 361, 366 (9th Cir.1976), as quoted in *Elkin v. Roudebush,* 564 F.2d 810, 813 (8th Cir. 1977)).

 ▪ *ii. Comments on professional competence.* "On the other hand," the Eighth Circuit Court of Appeals explained in *Buchholz,* "'a plaintiff is not deprived of [her] liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.'" *Buchholz,* 210 F.3d at 866 (quoting *Ludwig v. Board of Trustees of Ferris State Univ.,* 123 F.3d 404, 410 (6th Cir.1997)); *Raposa,* 790 F.2d at 1354 (the proper test "'distinguishes

between a stigma of moral turpitude, which infringes the liberty interest, and a charge of incompetence or inability to get along with coworkers, which does not'") (quoting *Stretten,* 537 F.2d at 366, as quoted in *Elkin,* 564 F.2d at 813).

In *Mascho v. Gee,* 24 F.3d 1037 (8th Cir.1994), the Eighth Circuit Court of Appeals surveyed prior precedent demonstrating the insufficiency of comments regarding a plaintiff's job performance or professional competence to support a due process claim:

Unsatisfactory performance or general misconduct are insufficient to create a stigma that implicates an employee's liberty interest in his reputation. *Robinson v. City of Montgomery City,* 809 F.2d 1355 (8th Cir.1987); *Shands,* 993 F.2d at 1347. In *Robinson,* we held that a city press release was insufficiently stigmatizing to implicate the liberty interests of a discharged police chief where the press release indicated that the city was dissatisfied with the chief's performance. *Robinson,* 809 F.2d at 1356. Similarly, in *Shands* we held that general allegations of misconduct and insubordination did not rise to the requisite level of constitutional stigma. *Shands,* 993 F.2d at 1347. We noted that "[t]he requisite stigma has been found in cases in which the employer has accused the employee of dishonesty, immorality, criminality, racism, or the like." *Id.* Furthermore, we rejected a claim that such stigma might be created by innuendo from inferences drawn from general allegations of misconduct and insubordination.

The statements made by the Department and its employees in the case before us do not appear to create the level of stigma necessary to implicate Mr. Mascho's liberty interest in his reputation. The official reason given for his discharge, namely, "not performing the functions of a supervisor," amounts to no more than the statement of dissatisfaction issued by the city in *Robinson.*

The reasons advanced by the Department in the ESD proceedings, that Mascho failed to comply with the spirit of the drug-free workplace policy by failing to report suspected drug usage, is also insufficiently stigmatizing. He was not accused of dishonesty, immoral acts, criminal activity, or racism. Furthermore, behavior such as dishonesty, immorality, criminality, or racism cannot be inferred from a charge that Mr. Mascho overlooked drug use by crew members. In fact, much less may be implied about Mr. Mascho's character than might be possible with the general accusation of misconduct in *Shands*. Accordingly, we hold that Mr. Mascho was not so stigmatized by the statements made by the Department as to implicate his liberty interest under the Fourteenth Amendment. Since the requisite level of stigma does not attach to the statements made, we do not reach the question of whether they were publicized.

*Mascho,* 24 F.3d at 1039.

The requirement of something more than comments upon the plaintiff's professional competence is borne out by numerous other decisions of the Eighth Circuit Court of Appeals. *See, e.g., Waddell,* 108 F.3d at 895–96 (noting that "[t]he requisite stigma has generally been found in cases in which the employee has been accused of dishonesty, immorality, criminality, racism, or the like," but finding that comments that a credit union employee was not "bondable," although "bondability" was a requirement of the job, did not carry sufficient stigma); *Shands,* 993 F.2d at 1347 ("A charge of insubordination alone is normally insufficient to implicate a liberty interest [and][a]lthough misconduct could conceivably include accusations serious enough to implicate a liberty interest, the general allegation of misconduct in this case does not by itself rise to the level of constitutional stigma," and finding that "innuendo" suggesting "serious misconduct" was not sufficiently connected to the plaintiffs' discharges to add the necessary additional stigma to sustain their claim)

(internal citations omitted); *Green v. St. Louis Housing Auth.,* 911 F.2d 65, 69 (8th Cir.1990) ("Falsely charging an employee with unsatisfactory job performance when terminating him does not infringe his liberty interest, because it does not carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty.") (internal quotation marks and citations omitted); *Raposa,* 790 F.2d at 1354 (noting that "[t]eacher competencies are not 'matters of constitutional dimensions,' but are uniquely appropriate to state and local administration," and that "[a] statement that is basically one alleging conduct that fails to meet professional standards is a statement which does not impinge upon a liberty interest"); *Nathanson v. United States,* 630 F.2d 1260, 1264–65 (8th Cir.1980) (holding that comments that the plaintiff was discharged as the "result of [his] duty performance," because he had "failed to demonstrate the necessary qualifications for successful performance in this position," including a specification of inadequacies in performance, did not involve the type of stigmatizing charges that would preclude a person from obtaining future employment); *and compare Winegar,* 20 F.3d at 899 ("We find that allegations of unjustified child abuse are sufficiently stigmatizing to a teacher's reputation, honor, and good name in the community to implicate liberty interests."); *Post,* 980 F.2d at 493 (finding that the plaintiff had a liberty interest at risk, because he was terminated for "alleged gambling activity," which the court concluded was enough that "his good name, reputation, honor, or integrity is at stake because of what the government is doing to him") (internal quotation marks and citations omitted).

***iii. "Stigma" from Chief Byrne's comments.*** The comments on which Mercer's "procedural" due process claim are founded are the comments attributed to Chief Byrne in THE CEDAR RAPIDS GAZETTE, which suggest that Mercer did not "meet up" with the qualifications for a police officer and that her off-duty relationship with Captain Peters "adversely

affect[ed] the workplace." Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1. Neither comment accuses Mercer of "dishonesty, immorality, criminality, racism, [or] the like,'" *see Buchholz,* 210 F.3d at 866; *Waddell,* 108 F.3d at 895–96; *Winegar,* 20 F.3d at 899; *Shands,* 993 F.2d at 1347, or otherwise suggests that she was guilty of "moral turpitude." *See Raposa,* 790 F.2d at 1354. Nor considering the context of the comments and the record as a whole is there any reasonable inference that the comments carry such a stigma. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same).

■ At most, Chief Byrne's comments suggest Mercer was terminated for unsatisfactory performance or general misconduct, which is insufficient to support her due process claim. *Buchholz,* 210 F.3d at 866; *Mascho,* 24 F.3d at 1039; *Robinson,* 809 F.2d at 1356; *Shands,* 993 F.2d at 1347; *Green,* 911 F.2d at 69; *Raposa,* 790 F.2d at 1354. Indeed, the comments are similar to those found insufficient in *Nathanson,* but lack the further specification of inadequacies in performance at issue in that case, which still did not make the comments sufficiently stigmatizing. *Nathanson,* 630 F.2d at 1264–65 (holding that comments that the plaintiff was discharged as' the "result of [his] duty performance," because he had "failed to demonstrate the necessary qualifications for successful performance in this position," including a specification of inadequacies in performance, did not involve the type of stigmatizing charges that would preclude a person from obtaining future employment). Mercer seems to argue that Chief Byrne's reference to her off-duty relationship with Captain Peters heightens the stigmatizing effect of Chief Byrne's comments. However, the comment actually attributed to Chief Byrne in the newspaper report does not carry such an inference, because the comment related the off-duty relationship only to adverse effects upon the workplace, but did not suggest that an off-duty relationship, standing alone, was "immoral," or a proper ground for termination or public opprobrium. *See* Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1; *and compare Mascho,* 24 F.3d at 1039 (noting that the court had previously rejected a claim that the necessary stigma might be created by innuendo from inferences drawn from general allegations of misconduct and insubordination and also stating, "Furthermore, behavior such as dishonesty, immorality, criminality, or racism cannot be inferred from a charge that Mr. Mascho overlooked drug use by crew members. In fact, much less may be implied about Mr. Mascho's character than might be possible with the general accusation of misconduct in *Shands*.").

The court concludes that the public comments attributed to Chief Byrne are not sufficiently stigmatizing to sustain Mercer's "procedural" due process claim. Therefore, the defendants are entitled to summary judgment on this claim. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

### c. The "substantive" due process claim

Mercer's attempt to salvage her due process claim by asserting that it has a "substantive" due process alternative fares no better, even if "stigma" is irrelevant to

a "substantive" due process claim. First, there is considerable doubt that such a "substantive" due process claim is recognized under the law. *See Singleton v. Cecil*, 176 F.3d 419, 425–29 (8th Cir.1999) (reading Supreme Court precedent to suggest that there is no "substantive" due process protection for public employees), *cert. denied*, —— U.S. ——, 120 S.Ct. 402, 145 L.Ed.2d 313 (1999). However, even assuming such a claim is recognized, *see id.* (assuming, in the alternative, that such a claim could be recognized, the court concluded that the plaintiff had failed to sustain it), Mercer has not generated genuine issues of material fact on an essential element of such a claim, governmental action of a degree that violates "substantive" due process.

■ The Eighth Circuit Court of Appeals has explained that, for a public employee to sustain a "substantive" due process claim arising from her termination, she "must show that the government action was " 'truly irrational,' " that is, "something more than … arbitrary, capricious, or in violation of state law." ' " *Graning*, 172 F.3d at 617 (quoting *Anderson v. Douglas County*, 4 F.3d 574, 577 (8th Cir. 1993), *cert. denied*, 510 U.S. 1113, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), but omitting citations in *Anderson*). Mercer contends only that dismissal of the female participant in an affair, herself, but not the male participant, Captain Peters, is "arbitrary and capricious." Under *Graning*, however, "arbitrary and capricious" conduct is insufficient to sustain a "substantive" due process claim; what is required is "truly irrational" conduct. *Id.*

■ For much the same reason Mercer cannot identify any "similarly situated" person to sustain her equal protection claim, she cannot demonstrate that terminating her, but not firing Captain Peters, was either "arbitrary and capricious" or "truly irrational." Again, Mercer was a probationary employee, and Captain Peters was a permanent employee, and thus the two enjoyed different employment statuses in contemplation of law. *See* Iowa

Code § 400.8(3). A governmental decision to fire a probationary employee but retain a permanent employee purportedly engaged in the same conduct is neither "arbitrary and capricious" nor "truly irrational." *Graning*, 172 F.3d at 617 (requiring the latter kind of governmental action to sustain a substantive due process claim in the context of public employment). The difference in treatment is instead reasonably justified by the difference in the legal statuses of the two employees.

Therefore, the defendants are also entitled to summary judgment on Mercer's "substantive" due process claim, as Mercer cannot generate genuine issues of material fact on an essential element of that claim. *See* Fed. R. Civ. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same).

### 3. Qualified immunity and municipal liability

The defendants also assert that Chief Byrne is entitled to qualified immunity to Mercer's constitutional claims, because the law was not clearly established that his conduct would violate Mercer's constitutional rights. Furthermore, the defendants assert that the City is entitled to summary judgment on Mercer's constitutional claims, even if a constitutional violation could be shown, because Chief Byrne lacks the requisite final policy- and decision-making authority to bind the City for a single unconstitutional act, as all of his acts were subject to the review and approval or revocation of the Superintendent of the Department of Public Safety. The

court does not reach these contentions, however, because the court found above that the defendants are entitled to summary judgment on Mercer's constitutional claims on other grounds.

### C. The Sex Discrimination Claims

 Mercer asserts that, in addition to violating her constitutional rights, "Defendants' termination of Plaintiff was also a violation of 42 U.S.C. § 2000e–2," Second Amended Complaint, Counts I and II, ¶ 9. The court, like the parties, has construed this Title VII claim to be a "sex discrimination" claim, since Mercer has not identified any other characteristic protected by Title VII. *See supra*, n. 1. In her Second Amended Complaint, Mercer has consolidated into this federal action a "state civil rights" claim that "Defendants' termination of Plaintiff was in violation of Iowa Code Section 216 [Iowa Civil Rights Act (ICRA)] in that it was on account of Plaintiff's gender." Second Amended Complaint, Count V, ¶ 21. Thus, Mercer's state discrimination claim expressly identifies gender as the protected characteristic. Mercer's state and federal sex discrimination claims appear to be based primarily on Mercer's allegedly disparate treatment as compared to Captain Peters, which was also the basis for her equal protection claim, because Mercer alleges that the same conduct that violated her civil rights, as specified in ¶ 8 of Counts I and II, also violated Title VII. *See* Second Amended Complaint, Counts I and II, ¶ 9 & Count V, ¶ 21. There is no direct Title VII correlate to Mercer's due process claim, although it is possible that Mercer contends that Chief Byrne's negative comments, identified as the basis for her due process claim, constitute adverse employment action based on her sex in violation of Title VII.

Both the state and the federal sex discrimination claims are analyzed according to the *McDonnell Douglas* burden-shifting paradigm. *See O'Sullivan v. Minnesota,* 191 F.3d 965, 969 (8th Cir.1999) ("These claims [of gender discrimination] are governed by the familiar analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."); *and compare Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983). Federal law, however, is not controlling. We look simply to the analytical framework utilized by the federal courts in assessing federal law and not to a substitution of the language of the federal statutes for the clear words of the ICRA. *Hulme v. Barrett,* 449 N.W.2d 629, 631 (Iowa 1989)."); *Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n,* 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973). *See Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990).").

The defendants assert that it is doubtful that Mercer can generate a *prima facie* case of sex discrimination, but if she can, they have clearly articulated a legitimate, non-discriminatory reason—indeed, several such reasons—for discharging her, and she has not come forward with any evidence to prove that the defendants' reason is pretextual or any *additional* evidence that her termination actually resulted from a discriminatory animus. Mercer, however, contends that, not only can she generate a *prima facie* case of sex discrimination, she can establish that the defendants' conduct was pretextual, because of evidence that the purpose of the Internal Affairs investigation of events at her trailer was to manufacture grounds for dismissing her as a pretext for a dismissal actually aimed at her relationship with Captain Peters. She contends her evidence as a whole is sufficient to generate

genuine issues of material fact on her sex discrimination claims.

### 1. The Reeves decision and the burden-shifting analysis

The United States Supreme Court most recently clarified the burden-shifting analysis required for discrimination claims in *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). It should be noted, at least in passing, that, although the Supreme Court addressed the propriety of judgment as a matter of law after a jury trial in *Reeves,* its determinations are particularly helpful to the proper disposition of a motion for summary judgment. This is so, because the Court noted that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Id.* at ——, —— U.S. at ——, 120 S.Ct. at 2110 (quoting *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505).

In *Reeves,* the court explained the burden-shifting analysis as follows:

> *McDonnell Douglas* and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, the plaintiff must establish a prima facie case of discrimination. *Ibid.; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). . . . [Once the *prima facie* case is established,] [t]he burden . . . shift[s] to [the defendant] to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine, supra,* at 254, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. This burden is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Center, supra,* at 509, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. [A defendant meets] this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired [for a legitimate reason]. Accordingly, "the *McDonnell Douglas* framework—with its presumptions and burdens"—disappear[s], *St. Mary's Honor Center, supra,* at 510, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, and the sole remaining issue [i]s "discrimination *vel non,*" [U.S. *Postal Service Bd. of Governors v.]* *Aikens,* 460 U.S. [711,] 714, 103 S.Ct. 1478, 75 L.Ed.2d 403.

> Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S., at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.; see also St. Mary's Honor Center, supra,* at 507–508, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra,* at 256, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *St. Mary's Honor Center, supra,* at 511, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual," *Burdine, supra,* at 255, n.

10, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

*Reeves,* —— U.S. at ——, 120 S.Ct. at 2106.

More specifically, in *Reeves,* the Supreme Court explained that the Fifth Circuit Court of Appeals had erred by holding that "a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination." *Reeves,* —— U.S. at ——, 120 S.Ct. at 2108. The Court explained that, because the plaintiff must ultimately establish intentional discrimination, proof that the employer's proffered reason is unpersuasive is not *necessarily* enough, because "the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* However, " '[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.' " *Id.* (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742). The Court recognized that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* And, indeed, if the defendant's proffered reason is eliminated, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at ——, 120 S.Ct. at 2109. "Thus," the Court explained, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* The Court held that the appellate court below had "erred in proceeding from the premise that a plaintiff must *always* introduce additional, independent evidence of discrimination." *Id.* (emphasis added).

The holding in *Reeves* is directly applicable here, because it establishes that Mercer *may* rely on evidence that makes up her *prima facie* case in attempting to satisfy the third prong of the *McDonnell Douglas* analysis, contrary to the defendants' contentions. *See* Defendants' Brief in Support of Motion for Summary Judgment at 17. Although the defendants cannot be faulted for their assertion of a "pretext-plus" requirement at the third stage of the burden-shifting analysis, because their position was previously recognized by our own Circuit Court of Appeals, *see Stanback v. Best Diversified Products, Inc.,* 180 F.3d 903 (8th Cir.1999) (holding, in a two-to-one decision prior to *Reeves,* that the pretext-plus test is the law of this circuit), the holding in *Reeves* puts an end to the requirement that the plaintiff must always show "pretext-plus" in order to prevail. *See Cherry v. Menard, Inc.,* 101 F.Supp.2d 1160, 1168 (N.D.Iowa 2000) (recognizing the demise of the "pretext-plus" test employed in this circuit with the *Reeves* decision).

Although the *Reeves* decision clarified the nature of proof required at the third stage of the burden-shifting analysis, the Court reiterated that "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves,* —— U.S. at ——, 120 S.Ct. at 2111; *see also id.* at ——, 120 S.Ct. at 2106 ("Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' ") (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

### 2. Application of the burden-shifting analysis

#### a. Mercer's prima facie case

Mercer asserts that she has established the elements of a *prima facie* case of disparate treatment based on sex as articulated in *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999). In *Breeding*, the Eighth Circuit Court of Appeals stated that, to make out a *prima facie* case of sex discrimination under Title VII, the plaintiff must show the following: "(1) that [the plaintiff] is within the protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (persons ... of the opposite gender in the Title VII sex discrimination context) were not treated the same." *Breeding*, 164 F.3d at 1156. The fourth element as stated in *Breeding*, however, necessarily implies that the nonmembers of the plaintiff's class who "were not treated the same" were "similarly situated," or the *prima facie* case would not serve its purpose.

That purpose, as the Eighth Circuit Court of Appeals explained in *Keathley v. Ameritech Corp.*, 187 F.3d 915 (8th Cir. 1999), "is to demonstrate that an 'adverse employment action occurred under circumstances which [give] rise to an inference of unlawful discrimination.'" *Keathley*, 187 F.3d at 921 (quoting *Wilson v. International Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir.1995), with internal quotation marks omitted in *Keathley*). Moreover, "[t]he prima facie case is 'generally sufficient to raise "an inference of discrimination only because we presume [the employer's decisions], if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."'" *Id.* (quoting *Rinehart v. City of Independence, Mo.*, 35 F.3d 1263, 1268 (8th Cir. 1994), *cert. denied*, 514 U.S. 1096, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995), in turn quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d

957 (1978)). Indeed, in one of its most recent formulations of a *prima facie* case under the *McDonnell Douglas* burden-shifting paradigm, the Eighth Circuit Court of Appeals recast the final element of a *prima facie* case of discrimination to be that the plaintiff "suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Allen v. Interior Constr. Servs., Ltd.*, 214 F.3d 978, 980 (8th Cir. 2000) (ADA case).

In *Williams v. Ford Motor Company*, 14 F.3d 1305 (8th Cir.1994), the court also recognized that "[t]he prima facie case requires only that [the plaintiff] establish facts adequate to permit an inference of discrimination." *Williams*, 14 F.3d at 1308.[3] In *Williams*, a case in which the plaintiff alleged that he was not reinstated because of race in violation of Title VII, the court formulated the final element of the plaintiff's *prima facie* case as requiring evidence that "*similarly situated* employees outside [the plaintiff's] protected class were reinstated to their positions." *Id.* (emphasis added). Similarly, in *Allen*, in analyzing the plaintiff's *prima facie* case, the court noted that "disparate treatment" itself raises the necessary inference of discrimination. *Allen*, 214 F.3d at 980. Logically, where Mercer has alleged that she was discharged after she engaged in certain conduct, comparing her with any of the numerous male officers who were not discharged, but who never engaged in the same or comparable conduct, simply would not give rise to an inference of discrimination, because any of the differences between Mercer and those officers, besides her gender, could be the cause of the disparate treatment. Rather, an inference of discrimination on the basis of a protected characteristic only arises when similarly situated persons, lacking the plaintiff's protected characteristic (in this case, persons of the opposite gender), are treated differently.

---

**3.** As discussed above, the plaintiff relied on *Williams*, which is a Title VII case, for the

definition of "similarly situated" in support of her equal protection claim.

Therefore, tailoring the elements of Mercer's *prima facie* case of disparate treatment based on sex to the circumstances of the alleged discrimination, *see, e.g., Breeding,* 164 F.3d at 1156 ("The elements of a prima facie case are not inflexible and vary slightly with the specific facts of each case.") (citing *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990–91 (8th Cir. 1998)); *Williams,* 14 F.3d at 1308 ("In sum, '[t]he elements of a prima facie case vary with the circumstances of the alleged discrimination.'") (quoting *Jones v. Frank,* 973 F.2d 673, 676 (8th Cir.1992)), the court concludes that Mercer's *prima facie* case of sex discrimination consists of the following: (1) she is within the protected class (*i.e.,* she is female, for purposes of a Title VII sex discrimination claim brought by a female); (2) she was qualified to perform her job; (3) she was discharged; and (4) a "similarly situated" male employee was not discharged. *Cf. Breeding,* 164 F.3d at 1156; *Williams,* 14 F.3d at 1308.

The defendants attack the second and fourth elements of Mercer's *prima facie* case. As to the second element, the defendants contend that Mercer's conduct during the altercation with her estranged husband at her trailer demonstrates that she lacks the good judgment necessary to be a police officer. Although the defendants assert that Mercer "arguably" was not qualified to continue in her position in light of her poor judgment, Mercer's evidence of her prior positive performance evaluations, and indeed, the defendants' concession that the point is "arguable," demonstrate that there is a genuine issue of material fact on this "qualification" element of Mercer's *prima facie* case. *See Allen,* 214 F.3d at 980 (observing that, to defeat summary judgment, the plaintiff must establish a factual dispute as to each element of her *prima facie* case, citing *Weber v. American Express Co.,* 994 F.2d 513, 515–16 (8th Cir.1993)); *accord* FED. R. CIV. P. 56(c); *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492.

Thus, the adequacy of Mercer's *prima facie* case of sex discrimination, for summary judgment purposes, turns on whether she has generated a genuine issue of material fact on the fourth element, the "inference of discrimination" element, *see Allen,* 214 F.3d at 980; *Keathley,* 187 F.3d at 921, which is cast in this case in terms of whether she has shown that a "similarly situated" male employee was not discharged. *Cf. Breeding,* 164 F.3d at 1156; *Williams,* 14 F.3d at 1308. The defendants contend that Mercer cannot show that she was treated differently than any similarly situated male officer, because both of the combatants at the trailer, Mercer and her estranged husband, were terminated from their jobs with the Cedar Rapids Police Department.

The *Williams* decision provides further guidance on the proof necessary to sustain the fourth element of Mercer's *prima facie* case. As noted above, in *Williams,* the Eighth Circuit Court of Appeals stated that "'for purposes of establishing a prima facie case [the court] consider[s] whether the employees are involved in or accused of the same or similar conduct and disciplined in different ways.'" *See Williams,* 14 F.3d at 1309 (emphasis added) (quoting *Boner,* 674 F.2d at 697). This court notes that, in *Williams,* there is no indication that the parties ever contested the question of whether the plaintiff and employees offered for comparison were similarly situated "in contemplation of law." *See id.* at 1308–1309; *and compare Post,* 980 F.2d at 495 (where the persons identified for comparison are "not similarly situated, either in fact or in contemplation of law," the plaintiff's disparate treatment claim cannot be sustained). Thus, *Williams* is distinguishable from the present case, in which the court held above that Mercer is not "similarly situated" *as a matter of law* to the male employee offered for comparison, where Mercer was a probationary officer, with no civil service protection, and Captain Peters was a permanent employee, with civil service rank and protections, pursuant to IOWA CODE

§ 400.8. *See supra,* Section II.B.1.b.v. The fact that Mercer and Captain Peters were not similarly situated *as a matter of law* would seem to rob the offered comparison of any inference at all of sex discrimination arising from Mercer's supposed disparate treatment. *See Post,* 980 F.2d at 495.

However, in *Williams,* the court also cautioned that " '[t]he burden of establishing a prima facie case of disparate treatment is not onerous ...,' " and that "[t]he district court must not conflate the prima facie case with the ultimate issue of discrimination." *Williams,* 14 F.3d at 1308 (quoting *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089, for the first proposition, and citing *Johnson v. Arkansas State Police,* 10 F.3d 547, 551 (8th Cir.1993), for the second). Therefore, assuming that consideration of the legal distinction between Mercer's and Captain Peters's employment statuses would make the plaintiff's *prima facie* showing too onerous, or impermissibly conflate the *prima facie* case with the ultimate issue of discrimination—that is, that it would impermissibly "hopscotch" over the second and third prongs in the *McDonnell Douglas* analysis, by introducing consideration of what may be a legitimate, non-discriminatory reason for the difference in treatment that properly belongs to the second prong of the analysis, or a legal bar to Mercer's ability to prove pretext or intentional discrimination, which properly belongs to the third prong of the analysis—the court will assume for now that Mercer has satisfied the requirements of her *prima facie* case. She has done so on *factual* grounds, as the necessary factual *prima facie* showing of "similarly situated" employees is (or may be) limited by *Williams,* by pointing to evidence that she was treated differently than Captain Peters, a male person accused of the same conduct, an off-duty, extra-marital relationship. *See Williams,* 14 F.3d at 1309.

This assumption indicates how thin Mercer's *prima facie* showing is in this case. In *Allen v. Interior Construction Services,* the Eighth Circuit Court of Appeals stated that "evidence of disparate treatment is not the exclusive means by which a plaintiff may establish an inference of discrimination [to sustain her *prima facie* showing of discrimination]; any credible evidence tending to establish that an employer acted adversely to an individual 'on account of' [her] [protected characteristic] will suffice." *Allen v. Interior Constr. Servs., Ltd.,* 214 F.3d 978, 980 (8th Cir.2000). However, in this case, the court does not find that Mercer has put forward any evidence *other than* her purported disparate treatment that would support the necessary inference in her *prima facie* case. Evidence that Chief Byrne asked Mercer about her relationship with Captain Peters does not give rise to an inference of sex discrimination toward Mercer, when Chief Byrne also asked Captain Peters about his relationship with Mercer, nor, as explained below, does any of the evidence Mercer offers to show "pretext" give rise to an inference of discrimination.

Nevertheless, the court assumes for the sake of this summary judgment motion that Mercer· can establish her *prima facie* case of sex discrimination, and therefore turns to the other prongs in the *McDonnell Douglas* analysis, as clarified in *Reeves.*

### b. The defendants' legitimate, non-discriminatory reason

The defendants contend that, even if the fourth element of Mercer's *prima facie* case is satisfied by comparing Mercer with Captain Peters, Mercer's sex discrimination claim still fails as a matter of law. They assert that Mercer was terminated for a plethora of legitimate, non-discriminatory reasons, including Chief Byrne's determination, supported by a majority of the members of the Functional Management Team, that Mercer had engaged in misconduct justifying her dismissal from probationary employment. The list of Mercer's purported misconduct includes the fact that Mercer failed to exercise the good judgment required of a police officer during the altercation with her estranged husband at her trailer; she gave inconsis-

tent statements to Internal Affairs officers suggesting that she was not always truthful; she gave a statement concerning her relationship with Captain Peters that was inconsistent with his own statement, suggesting that one of them was not telling the truth; she disregarded a direct order to keep matters discussed during an Internal Affairs investigation confidential from anyone but her attorney; and her relationship with Captain Peters purportedly caused disruption and morale problems on their shifts.

As the Supreme Court reiterated in *Reeves,* once the plaintiff's *prima facie* case is established, "[t]he burden ... shift[s] to [the defendant] to 'produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Reeves,* —— U.S. at ——, 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089). Furthermore, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *St. Mary's Honor Center,* 509 U.S. at 509, 113 S.Ct. 2742). More specifically, a defendant meets "this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired [for a legitimate reason]." *Id.* The evidence proffered by the defendants in support of their legitimate, non-discriminatory reasons for terminating Mercer is sufficient under this standard.

#### c. *Proof of "pretext" and "intentional discrimination"*

Thus, the court arrives at the third prong of the *McDonnell Douglas* burden-shifting analysis. Mercer contends that the defendants "cannot seriously contend that their explanation for Plaintiff's termination does not appear to be a transparent pretext." *See* Plaintiff's Brief In Support Of Resistance To Motion For Summary Judgment at 10. This is so, Mercer argues, in light of evidence that, before the altercation at the trailer occurred or the

Internal Affairs investigation even began, Chief Byrne had talked to Mercer and Captain Peters two or three times each about their relationship, an assistant chief had asked for all of Mercer's employment evaluations, Shawn Mercer had already vandalized Captain Peters's tires and Mercer's trailer, and the trailer vandalism incident had been reported to Marion Police, but Shawn Mercer had not been discharged. Mercer also asserts that the evidence shows that Cedar Rapids police manipulated the reporting of incidents at her trailer to provide an excuse for an Internal Affairs investigation of Mercer and her relationship with Captain Peters. She also contends that the defendants' assertions that she and Shawn Mercer were "similarly situated" and treated the same way is belied by the fact that prior to the altercation at the trailer, Shawn Mercer engaged in much more frequent and serious misconduct than Mercer ever did, but was not discharged, and the failure to discharge Captain Peters for conduct similar to hers heightens the pretextual nature of the defendants' proffered reasons.

The defendants contend that this evidence does not demonstrate either that their proffered reasons for discharging Mercer were pretextual or that the real reason for discharging her was sex discrimination. They also contend that Mercer has produced no additional evidence, beyond her *prima facie* case and purported showing of pretext, to demonstrate intentional discrimination. They specifically contend that the differences in rank and duties between Mercer and Captain Peters, as established by provisions of the Cedar Rapids Municipal Code, demonstrate that, as a matter of law, the positions of Police Captain and Patrol Officer are dissimilar.[4] Finally, the defendants assert that Chief Byrne cannot be individually liable under either Title VII or IOWA CODE CH. 216.

---

4. This argument would also have served the defendants in their challenge to Mercer's

equal protection claim, but they did not raise it there.

***i. The third-stage analysis under Reeves.*** As mentioned above, the *Reeves* decision dispelled the notion that the plaintiff *must always* show "pretext-plus" to satisfy the final stage of the *McDonnell Douglas* analysis—that is, the Court held that the plaintiff is not always required to come forward with evidence in addition to her *prima facie* case and evidence of that the defendant's proffered reason for its actions is pretextual to meet her ultimate burden to show that the real reason for the adverse employment action was intentional discrimination. *See Reeves*, —— U.S. at ——, 120 S.Ct. at 2109 (explaining that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and holding that the court below had "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination."). In addition, the Court provided some guidance on what evidence *is* sufficient to satisfy the plaintiff's burden at this stage of the analysis.

Although the plaintiff is not required to satisfy a "pretext-plus" obligation to produce additional evidence beyond the *prima facie* case and showing of pretext at this final stage of the burden-shifting analysis, and the Court in *Reeves* reiterated that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," *see id.*, the Court also stated, "This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability." *Id.* at ——, 120 S.Ct. at 2109. The Court clarified which cases will still require judgment in favor of the defendant, even if the plaintiff has established a *prima facie* case and pretext, because the showing of intentional discrimination is insufficient:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could con-

clude that the action was discriminatory. *For instance, an employer would be entitled to judgment as a matter of law [or summary judgment] if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.* See Aka v. Washington Hospital Center, 156 F.3d [1284,] 1291–1292 [(D.C.Cir.1998) (en banc)]; see also Fisher v. Vassar College, 114 F.3d [1332,] 1338 [(2d Cir.1997) (en banc)] ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent"). To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not " 'treat discrimination differently from other ultimate questions of fact.' " *St. Mary's Honor Center, supra*, at 524, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (quoting *Aikens*, 460 U.S., at 716, 103 S.Ct. 1478, 75 L.Ed.2d 403).

*Whether judgment as a matter of law [and, by analogy, summary judgment,] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. See infra,* at 2110.

*Reeves*, —— U.S. at ——, 120 S.Ct. at 2109. The Court concluded that it "need not—and could not—resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law." *Id.*

Nevertheless, the Court's analysis in *Reeves* of the facts then before it may be helpful here. Although "pretext-plus" was not *required*, the Court held in *Reeves* that judgment as a matter of law in favor of the employer was *not* appropriate, because "in addition to establishing a prima facie case of discrimination and creating a jury issue as to the falsity of the employer's explanation, [the plaintiff] introduced additional evidence that [a company official] was motivated by age-based animus and was principally responsible for [the plaintiff's] firing." *Id.* at ——, 120 S.Ct. at 2110. In addition to age-based, derogatory comments, the Court noted that the company official at the center of the plaintiff's allegations had subjected the plaintiff to disparate treatment by conducting an "efficiency study" only of the plaintiff's production line, even though the plaintiff and a younger employee who was also a line supervisor had nearly identical rates of productivity, and the company official had thereafter placed only the plaintiff on probation. *Id.* at ——, 120 S.Ct. at 2111. On the "ultimate question," the Court concluded,

> Given that [the plaintiff] established a prima facie case of discrimination, introduced enough evidence for the jury to reject [the employer's] explanation, and produced additional evidence of age-based animus, there was sufficient evidence for the jury to find that [the employer] had intentionally discriminated.

*Reeves*, —— U.S. at ——, 120 S.Ct. at 2112.

■ *ii. The role of evidence of disparate treatment.* The Court's reliance, in part, on evidence of disparate treatment of similarly situated persons at the third stage of the burden-shifting analysis in *Reeves* suggests the continued vitality of the proposition, recently reiterated by the Eighth Circuit Court of Appeals, that "evidence of disparate treatment can support a finding of pretext." *Phillips v. Union Pac. R.R. Co.*, 216 F.3d 703, 706 (8th Cir. 2000). However, the Eighth Circuit Court of Appeals has added a further caveat: "[Evidence of disparate treatment] can only do so in those cases in which the

plaintiff and the party alleged to have received more favorable treatment were 'similarly situated *in all relevant respects.*'" *Id.* (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988), with citations omitted in *Phillips*) (emphasis added). In another recent case, the Eighth Circuit Court of Appeals stated that the "strong showing" that the disparately treated employees are "similarly situated in all relevant respects ... is required when the only evidence of pretext or discrimination is disparate treatment." *Scott v. County of Ramsey*, 180 F.3d 913, 917 (8th Cir.1999) (citing *Harvey*, 38 F.3d at 972). The court in *Scott* explained further that, "when ... the evidence of disparate treatment is offered as one component of circumstantial proof of pretext, the 'evidence does not need to reach the degree of certainty required of plaintiffs who present no proof of discrimination besides [disparate treatment.]'" *Id.* at 917–18 (quoting *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 611 (8th Cir.1997)).

The Supreme Court did not specifically echo this caveat in *Reeves*. Rather, the Court in *Reeves* found copious other evidence of age-based animus in the case before it, so that the disparate treatment of the plaintiff as to the efficiency study was but one component of the Court's intentional discrimination analysis. *See Reeves*, —— U.S. at ——, 120 S.Ct. at 2111. Hence, the circumstances in *Reeves* would not fit those in which the Eighth Circuit Court of Appeals has held that a "strong showing" that the employees offered for comparison are "similarly situated in all relevant respects" is required. *See Scott*, 180 F.3d at 917 (requiring a "strong showing" that the employees compared must be "similarly situated in all relevant respects ... when the only evidence of pretext or discrimination is disparate treatment"); *accord Phillips*, 216 F.3d 703, 706. Nevertheless, in *Reeves*, the Court was careful to establish that the employees given disparate treatment were similarly situated in their positions, both line supervisors, and in regard to their productivity rates, *id.*,

and it is not clear in what other respect similarities between the two line supervisors would be relevant, even for the "strong showing" necessary to satisfy the Eighth Circuit standard.

Moreover, the "strong showing" that the compared employees are "similarly situated in all relevant respects," at least in the circumstances where disparate treatment is the only evidence of discrimination or pretext, is in accord with the factors the Supreme Court identified in *Reeves* as pertinent to the third-stage analysis, including consideration of "the strength of the plaintiff's prima facie case [and] the probative value of the proof that the employer's explanation is false." *Id.* at ——, 120 S.Ct. at 2109. If the plaintiff's *prima facie* case or showing of pretext depends solely on disparate treatment, it follows that the strength of the *prima facie* case or showing of pretext is considerably bolstered if the persons compared are "similarly situated in all relevant respects." This court concludes that the decisions in *Phillips* and *Scott* are therefore still valid, in light of *Reeves*, as to the proposition that a "strong showing" that the employees compared must be "similarly situated in all relevant respects [is required] when the only evidence of pretext or discrimination is disparate treatment." *Scott*, 180 F.3d at 917; *accord Phillips*, at 706.

***iii. Mercer's third-stage showing.*** Mercer points to evidence that the altercation at the trailer and other incidents of purported misconduct were only a pretext for her dismissal, and the court concludes that she may well have produced enough evidence to give rise to an inference, even a strong inference, that the conduct to which the defendants point was not the real reason for her termination. Therefore, the question becomes, is this a case in which Mercer's *prima facie* case and showing of the falsity of the employer's explanation are adequate to present a jury question on liability? *See Reeves*, —— U.S. at ——, 120 S.Ct. at 2108–09.

The court concluded above that Mercer's *prima facie* showing of intentional discrimination was "thin," because it depended entirely upon purported disparate treatment of "similarly situated" persons, as "similarly situated persons" is generously defined for purposes of a *prima facie* case in *Williams*. *See Williams*, 14 F.3d at 1309 ("'[F]or purposes of establishing a prima facie case* [the court] consider[s] whether the employees are involved in or accused of the same or similar conduct and disciplined in different ways.'") (quoting *Boner*, 674 F.2d at 697) (emphasis added). At the third stage of the burden-shifting analysis, however, the court is required to consider whether "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision." *Reeves*, —— U.S. at ——, 120 S.Ct. at 2109. Indeed, as explained in reference to Mercer's equal protection claim, when the court in *Williams* reached the third stage of the burden-shifting analysis, the court found that the plaintiff and the other employees were not "'similarly situated in all relevant respects.'" *See Williams*, 14 F.3d at 1309 (quoting *Smith*, 770 F.2d at 723, in turn quoting *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089). Instead, the court recited a laundry list of factual differences between the plaintiff and the employees with whom he compared himself to demonstrate that the plaintiff and the other employees were not "similarly situated in all relevant respects." *Id.* at 1309–10.

Here, the record *does* conclusively reveal another, nondiscriminatory reason for the employer's apparently disparate treatment of Mercer and Captain Peters. *Reeves*, —— U.S. at ——, 120 S.Ct. at 2109. That reason is that Mercer and Captain Peters are *not* similarly situated *in contemplation of law*. Again, Mercer was a probationary employee, and Captain Peters was a permanent employee, so that the two enjoyed different employment statuses in contemplation of law. *See* Iowa Code § 400.8(3). Therefore, even though Mercer has established a *prima facie* case and set forth sufficient evidence to reject

the defendant's explanation, no rational factfinder could conclude that the action was discriminatory, *see Reeves,* —— U.S. at ——, 120 S.Ct. at 2109, because Mercer and Captain Peters were not "similarly situated in all relevant respects." *Williams,* 14 F.3d at 1309.

Thus, Mercer's weak *prima facie* case dissolves entirely as a basis for showing intentional discrimination at the third stage of the *McDonnell Douglas* analysis; moreover, the court finds that Mercer's showing of pretext has no probative value on the issue of intentional discrimination, because that falsity does not give rise to an inference that the real reason for Mercer's termination *was her sex. Id.* (factors to be considered in deciding whether the *prima facie* case plus a showing of pretext suffice to give rise to inferences of intentional discrimination "include the strength of the plaintiff's prima facie case [and] the probative value of the proof that the employer's explanation is false"). Mercer herself asserts that the real reason for her termination was Chief Byrne's objection to her off-duty, extra-marital relationship with Captain Peters, not her sex. Thus, she has given rise to inferences only that the pretextual reasons conceal something other than discrimination based on sex. *See Fisher,* 114 F.3d at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent."); *see also Reeves,* —— U.S. at ——, 120 S.Ct. at 2109 (quoting *Fischer* with favor). The "disparate treatment" of Mercer and Captain Peters does not demonstrate either pretext or intentional discrimination in this case, because Mercer and Peters were not "similarly situated in all relevant respects." *See Scott,* 180 F.3d at 917 (requiring a "strong showing" that the employees compared must be "similarly situated in all relevant respects ... when the only evidence of pretext or discrimination is disparate treatment."); *accord Phillips,* at 706.

The court cannot find that evidence that an employer objected to an off-duty, extra-marital relationship between two employees, in the absence of disparate treatment of the two employees on the basis of their genders, necessarily gives rise to an inference of sex discrimination and there is no other evidence that Chief Byrne's objections to Mercer's relationship with Captain Peters resulted in conduct giving rise to an inference that Mercer's discharge was because of her sex. *Compare Reeves,* —— U.S. at ——, 120 S.Ct. at 2110–11 (identifying other circumstantial evidence of age-based animus besides disparate treatment); *Scott,* 180 F.3d at 917–18 (finding that the "strong showing" was not required in that case, because "the evidence of disparate treatment [wa]s offered as one component of circumstantial proof of pretext," not the sole evidence of pretext). Chief Byrne expressed his objections to the relationship to both Mercer and Captain Peters, and Mercer has not pointed to any evidence that she was referred to in sex-associated, derogatory terms, but her male partner in the affair was not, or any evidence that her male partner in the affair was congratulated and admired for the affair while she was denigrated. *Compare Reeves,* —— U.S. at ——, 120 S.Ct. at 2110–11 (detailing derogatory comments and incidents indicating an age-based animus). To the extent that Mercer may have pleaded that the conduct giving rise to her due process claim, Chief Byrne's public, negative comments about her qualifications, constituted adverse action for purposes of her Title VII claim, those comments do not suggest any sex-based animus, because they are entirely devoid of any reference to Mercer's gender.

Thus, in this case, the relatively strong showing of pretext is coupled with a *prima facie* case that does not stand up to scrutiny at the third stage of the *McDonnell Douglas* analysis, as the *prima facie* evidence of disparate treatment ultimately fails to give rise to any inference of intentional discrimination, and no other evidence of sex-based animus can be found in the record, either to demonstrate pretext or intentional discrimination. Thus, in this

case, a factfinder's disbelief of the reasons put forward by the defendant, even if that disbelief is accompanied by a suspicion of mendacity, cannot show intentional discrimination because of sex and there is no other evidence that can do so. In this case, rejection of the defendants' proffered reasons for terminating the plaintiff will *not* permit the trier of fact to infer the ultimate fact of intentional discrimination. *Compare id.* at ——, 120 S.Ct. at 2098 (" 'The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.' ") (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742).

In the absence of any inference of intentional discrimination based on sex at the third stage of the burden-shifting analysis, the defendants are entitled to summary judgment on Mercer's state and federal sex discrimination claims. *See id.* at ——, 120 S.Ct. at 2109 (judgment as a matter of law, and by analogy summary judgment, is appropriate if there is no inference of intentional discrimination).

### *D. Slander*

 Like Mercer's due process claim, Mercer's common-law slander claim in Count III of her Second Amended Complaint is founded on the comments attributed to Chief Byrne in THE CEDAR RAPIDS GAZETTE, which suggest that Mercer did not "meet up" with the qualifications for a police officer and that her off-duty relationship with Captain Peters "adversely affect[ed] the workplace." Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1. Although the comments attributed to Chief Byrne in the newspaper story are not sufficiently "stigmatizing" to sustain Mercer's due process claim, that conclusion does not necessarily entitle the defendants to summary judgment on Mer-

cer's common-law slander claim. This is so, because the standard for "stigma" of constitutional proportions is considerably higher than that for common-law defamation. As noted above, ordinarily, comments are sufficiently "stigmatizing" to sustain a due process claim only if they accuse the plaintiff of "dishonesty, immorality, criminality, racism, [or] the like,' " *see Buchholz,* 210 F.3d at 866; *Waddell,* 108 F.3d at 895–96; *Winegar,* 20 F.3d at 899; *Shands,* 993 F.2d at 1347, or otherwise suggest that she was guilty of "moral turpitude." *See Raposa,* 790 F.2d at 1354. " '[A] plaintiff is not deprived of [her] liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.' " *Buchholz,* 210 F.3d at 866 (quoting *Ludwig,* 123 F.3d at 410); *Raposa,* 790 F.2d at 1354. On the other hand, public comments are defamatory under the common-law standard if they tend to injure the reputation of another person, or to injure the person in the maintenance of the person's business. *See, e.g., Hill v. Hamilton County Public Hosp.,* 71 F.Supp.2d 936, 953 (N.D.Iowa 1999). Indeed, statements are defamatory *per se*— that is, the court can presume as a matter of law that their publication will have defamatory effect—if they carry imputations affecting a person in his or her business, trade, profession, or office. *Id.*

Even so, the defendants have moved for summary judgment on Mercer's slander claim. The defendants contend that Mercer has not expressly alleged slander *per se,* and has in fact specifically alleged that Chief Byrne made the comments with malice, so that Mercer must prove malice, falsity, and special harm in support of her slander claim. They contend that there is a complete absence of malice on the record now before the court. They contend further that Chief Byrne's comments to the press were made with a qualified privilege that bars liability, because the comments were made in good faith on a matter of interest to the community, the comments were limited in their scope to this purpose,

and they were made on the proper occasion and in a proper manner to proper parties. Moreover, the defendants contend that the comments are simply insufficiently specific or damaging to be defamatory, because they constitute nothing more than non-actionable statements of opinion rather than actionable statements of objective fact, and in any event, are true upon the record as a whole.

■■■ Mercer denies that she has in any way waived or eschewed a claim of slander *per se* by pleading the elements necessary to sustain a claim of slander if the comments at issue are held not to be *per se* defamatory. She contends that no qualified privilege extends to publications to the general public, and thus she does not need to show actual malice to overcome any qualified privilege for Chief Byrne's comments; legal malice will suffice. The lack of legal excuse for demonstrably false comments suffices, she contends, to satisfy the applicable malice requirement. She contends further that Chief Byrne's comment conveyed the objective fact, not simply an opinion, that she was not qualified to be a police officer, and thus the comment constituted slander *per se* as a criticism of her professional competence.

### 1. The "twin torts" of libel and slander

■■■ As this court has explained on a number of occasions, defamation under Iowa law consists of the "twin torts" of "libel"—defined as malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule, or to injure the person in the maintenance of the person's business—and "slander"—defined as oral publication of defamatory material. *See Hill,* 71 F.Supp.2d at 953; *King v. Sioux City Radiological Group, P.C.,* 985 F.Supp. 869, 877 (N.D.Iowa 1997); *Jenkins v. Wal-Mart Stores, Inc.,* 910 F.Supp. 1399, 1425–27 (N.D.Iowa 1995); *Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097, 1124–29 (N.D.Iowa 1994); *Thomas v. St. Luke's Health Sys.,*

*Inc.,* 869 F.Supp. 1413, 1441–45 (N.D.Iowa 1994), *aff'd,* 61 F.3d 908 (8th Cir.1995) (table op.); *O'Bryan v. KTIV Television,* 868 F.Supp. 1146, 1169–71 (N.D.Iowa 1994), *aff'd in pertinent part,* 64 F.3d 1188, 1195 (8th Cir.1995). Recent decisions of the Iowa Supreme Court are in accord with these definitions. *See Kennedy v. Zimmermann,* 601 N.W.2d 61, 64 (Iowa 1999); *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998); *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997). The parties agree that "slander" is at issue here, apparently focusing on Chief Byrne's oral comments to the newspaper reporter, rather than the newspaper's printed publication of those comments, as the source of the wrong to Mercer. In order to prevail on a defamation claim, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Hill,* 71 F.Supp.2d at 953–54 (citing *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 115 (Iowa 1984), in turn citing *Vojak v. Jensen,* 161 N.W.2d 100, 104 (Iowa 1968)).

### 2. Qualified privilege

■■■ The defendants assert that they are entitled to a "qualified privilege," which bars liability on Mercer's slander claim in this case. "Qualified privilege provides immunity [to defamation claims] in some but not all instances." *Taggart v. Drake Univ.,* 549 N.W.2d 796, 803 (Iowa 1996). This court has explained the reason for, and elements of, qualified privilege as follows:

[T]he law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability. *Id.* (citing *Vojak,* 161 N.W.2d at 104); *Higgins v. Gordon Jewelry Corp.,* 433 N.W.2d 306, 308 (Iowa Ct. App.1988). The elements of a qualified

privilege defense are that (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only. *Knudsen v. Chicago & North Western Transp. Co.*, 464 N.W.2d 439 (Iowa 1990) (citing *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 552 (Iowa 1972)).

*Hill*, 71 F.Supp.2d at 953–54; *accord Taggart*, 549 N.W.2d at 803 ("Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication.").

### a. Communication to the general public

 As these elements indicate, the qualified privilege is not limitless. *See, e.g., Hill*, 71 F.Supp.2d at 954 ("Of course, the privilege must not be abused or exceeded.") (citing *Lara v. Thomas*, 512 N.W.2d 777, 786 (Iowa 1994)). Mercer contends that the defendants are not entitled to summary judgment on the basis of the qualified privilege here with regard to the last of these elements, that publication was in a proper manner and to proper parties only, because Chief Byrne made the allegedly slanderous statements to the general public. As a general rule, no qualified privilege attaches to statements made to the general public. *See, e.g., Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413, 1443 (N.D.Iowa 1994) ("The privilege does not extend to publication to the general public.") (citing *Rees v. O'Malley*, 461 N.W.2d 833, 837 (Iowa 1990)); *accord Brown v. First Nat'l Bank*, 193 N.W.2d 547, 552 (Iowa 1972) ("The defense of qualified privilege does not extend to a publication to the general public.").

 However, there is a caveat to this general rule: Publication to the general public does not negate the qualified privilege if the general public is a proper party to the communication, that is, *if the general public has a valid interest in the matter* giving rise to the allegedly defamatory publication. *See Rees*, 461 N.W.2d at 837 (" 'The qualified privilege by its very nature does not allow widespread or unrestricted communication. It does not permit parties to make communications to the general public *when the public does not have a valid interest.*' ") (quoting *Brown*, 193 N.W.2d at 552) (emphasis added); *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 892 (Iowa 1989) ("In determining whether the publication of the statement was excessive, the court must find a 'valid interest on the part of the general public which necessitated or justified' the broadcast.") (quoting *Brown*, 193 N.W.2d at 552). The defendant has the burden to demonstrate that the public has a valid interest in the dispute between the parties. *See id.* However, the court must make the determination of whether the qualified privilege is available as a matter of law. *Jones*, 440 N.W.2d at 892. In doing so, "[t]he court must consider the relation of the statements to the duties of the public official and the underlying purpose of the qualified privilege," and "[t]he challenged statements must be considered in the complete context of statements made by the public official." *Id.*[5]

---

**5.** Although the court makes a determination of whether the qualified privilege is *available* as a matter of law, on the basis of these considerations, whether the defendant can ultimately prove the defense of qualified privilege is a question of fact that depends upon the defendants' proof of the elements of the defense, *see Hill*, 71 F.Supp.2d at 953–54; *accord Taggart*, 549 N.W.2d at 803, and the plaintiff's failure to overcome that defense, for example, by proving that the statements were not made in good faith, but were instead made with "actual malice," as explained below. The "truth" of the challenged statements is not relevant to the court's determination of the *availability* of the qualified privilege, which instead turns solely on the factors identified in *Jones*, 440 N.W.2d at 892.

The defendants contend that Mercer has conceded that Chief Byrne had a duty to speak to the press concerning her discharge and that the general public had a legitimate interest in the termination of a public employee. Even in the absence of such a concession, however, the court would conclude that the qualified privilege is available for Chief Byrne's comments in their "complete context." *Id.* Chief Byrne's comments on Mercer's discharge were properly related to his public duties as Chief of Police. *Id.* (the court must consider "the relation of the statements to the duties of the public official"). His comments also fall within the purposes of the qualified privilege, *see id.*, which include "protect[ion] of his ... own interest or the interest of others." *Hill,* 71 F.Supp.2d at 953 (identifying the purposes of the qualified privilege). The circumstances of Mercer's discharge were such that, "in order to protect his ... own interest or the interest of others," *i.e.,* the interest of the citizens of Cedar Rapids in the management of the Cedar Rapids Police Department, Chief Byrne could reasonably be called upon to comment on the discharge of an officer.

However, the court declines the defendants' invitation to hold that they have proved the qualified privilege defense as a matter of law, because there are genuine issues of material fact on the elements of that claim as identified in *Hill,* 71 F.Supp.2d at 953–54, and *Taggart,* 549 N.W.2d at 803, particularly (but not exclusively) on the element of "good faith" in light of Mercer's contrary showing of "actual malice," as explained below.

**b. "Actual malice" and qualified privilege**

■ Even if Chief Byrne's statements were properly made to the general public, "[q]ualified privilege ... protects only those statements made without actual malice." *Taggart,* 549 N.W.2d at 804; *Hill,* 71 F.Supp.2d at 954 ("Therefore, the privilege is lost if the statements are not made in good faith, *Lara,* 512 N.W.2d at 786; *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 104 (Iowa 1985), or made with actual malice. *Knudsen,* 464 N.W.2d at 443; *Vinson,* 360 N.W.2d at 116."). In the absence of actual malice, however, the qualified privilege extends even to statements that are untrue. *Hill,* 71 F.Supp.2d at 954 (citing *Vojak,* 161 N.W.2d at 105; *Benishek,* 441 N.W.2d at 402).

[A] publication is no longer privileged and becomes actionable upon proof of actual malice. [*Vinson,* 360 N.W.2d at 116.] A finding of malice turns on the motive for the communication, and requires proof that the statement was made with ill will or wrongful motive. *Id.* Actual malice occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity. *Jones v. Palmer Communications, Inc.,* 440 N.W.2d 884, 894 (Iowa 1989); *McCarney v. Des Moines Register & Tribune Co.,* 239 N.W.2d 152, 156 (Iowa 1976).

*Taggart,* 549 N.W.2d at 804 (citations omitted); *see also Hill,* 71 F.Supp.2d at 954 (actual malice in this context " 'depend[s] on the motive for the statement,' " because it " 'requires proof that the statement was made with malice in fact, ill-will or wrongful motive' ") (quoting *Haldeman,* 376 N.W.2d at 103–04).[6]

**6.** The court must clarify the question of the proof necessary to show "actual malice" under Iowa law. In *Thomas,* this court noted that "actual malice" in the context of overcoming the qualified privilege differed from the "actual malice" necessary to prove libel of a public figure under *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), on the ground that the former required "ill will" toward the plaintiff, while the latter did not, but instead focused on the defendant's attitude toward the truth of the statements. *Thomas,* 869 F.Supp. at 1443 at n. 7 (citing *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990)). This court further stated that "actual malice" under the *New York Times* standard was shown if a statement was made " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id.* (quoting *Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 643 (8th Cir. 1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1293, 94 L.Ed.2d 150 (1987)). However, in

The court concludes that Mercer has generated genuine issues of material fact as to whether Chief Byrne's statements were made with "actual malice" for many of the same reasons she has generated genuine issues of material fact on the "pretext" part of the analysis of her Title VII claim. Evidence that Chief Byrne manufactured grounds for terminating Mercer, then published those false grounds as justifying his decision, would generate reasonable inferences that Chief Byrne not only "made [the statements] with knowledge that [they are] false or with reckless disregard for [their] truth or falsity," *Taggart,* 549 N.W.2d at 804, but that he made the statements with "ill will or wrongful motive," *see id.,* and specifically to "inflict harm through falsehood." *Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 296 (Iowa Ct.App.1985) (defining "actual malice" in this way). Therefore, although the defendants are entitled to raise the defense of qualified privilege as a matter of law, they are not entitled to summary judgment on the basis of that privilege, because there are genuine issues of material fact on Mercer's showing of "actual malice," which would overcome the privilege. Consequently, the court must consider whether Mercer's slander claim is otherwise actionable.

### 3. Slander and slander "per se"

The parties have devoted much time and attention to the question of whether Chief Byrne's comments constitute slander *per se,* because Mercer contends that the statements impugn her professional competence. The defendants contend that the challenged statements not only are not slanderous *per se,* they are not slanderous at all.

As this court has explained,
> Words are defamatory *per se* if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have defamatory effect. *Vinson,* 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.,* 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). Among such statements are defamatory imputations affecting a person in his or her business, trade, profession, or office. *Lara,* 512 N.W.2d at 785; *Vojak,* 161 N.W.2d at 104; *Galloway v. Zuckert,* 447 N.W.2d 553, 554 (Iowa Ct.App.1989)[, *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1526, 108 L.Ed.2d 765 (1990) ].

*Hill,* 71 F.Supp.2d at 953; *King,* 985 F.Supp. at 877; *Jenkins,* 910 F.Supp. at 1425–26; *accord Schlegel,* 585 N.W.2d at 222 ("Libel per se includes statements that have a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.") (citation omitted); *Kerndt,* 558 N.W.2d at 418 ("Defamatory statements affecting a person in his or her business, trade, profession, or office fall into this category, as do attacks on a person's integrity and moral character.") (citing *Lara,* 512 N.W.2d at 785). Statements constituting slander or libel *per se* are actionable without proof of malice, falsity, or special harm. *Hill,* 71 F.Supp.2d at 953 (citing *Lara,* 512 N.W.2d at 785; *Vinson,* 360 N.W.2d at 115–16; and *Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 295 (Iowa Ct.App.1985)); *accord Schlegel,* 585 N.W.2d at 222 ("When statements are libelous per se, they are actionable in and of themselves without proof of malice, falsity, or damage.") (also citing *Vinson,* 360 N.W.2d at 116).[7]

---

*Taggart,* the Iowa Supreme Court apparently disregarded this distinction, because the court stated that "actual malice" for purposes of overcoming the qualified privilege "occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity," the *New York Times* "actual malice" standard. *Taggart,* 549 N.W.2d at 804. Thus, the court in *Taggart* equated proof of "knowledge of falsity" or "reckless disre-

gard of falsity" with proof of the "ill will" necessary to establish "actual malice" to overcome the qualified privilege.

7. The Iowa Supreme Court explained further in *Schlegel* that, when the plaintiff proves defamation *per se,*
> the jury is allowed to award substantial damages without the necessity of the plaintiff proving actual damage to reputation.

■ However, because the qualified privilege for Chief Byrne's statements "applies to publications without regard to whether they are defamatory per se," *Taggart*, 549 N.W.2d at 803–04, Mercer must prove "actual malice" to overcome that privilege, even if Chief Byrne's statements constituted slander *per se*. *See id.* at 804; *see also Hill*, 71 F.Supp.2d at 954. Furthermore, Mercer is a "public figure" for purposes of her slander claim. *See White v. Fraternal Order of Police*, 909 F.2d 512, (D.C.Cir.1990) (*en banc*) (a police officer asserting defamation claims related to publication of newspaper stories about an investigation of his drug use was "concededly a public figure" for purposes of those claims); *Carroll v. City of Westminster*, 52 F.Supp.2d 546, 565–66 & n. 35 (D.Md.1999) (a police officer asserting a defamation claim related to publication of information about his drug tests was a "public figure" for purposes of that claim, because, under Maryland law, a police officer of any rank is a "public figure" for purposes of a defamation cause of action); *Olive v. City of Scottsdale*, 969 F.Supp. 564, 576 (D.Ariz.1996) (police officers are recognized as "public officials" for purposes of defamation claims under Arizona law). Therefore, she must prove "actual malice" in any event to prevail on her slander claim. *See, e.g., Schlegel*, 585 N.W.2d at 224 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346–47, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), as holding that public officials and public figures must prove actual malice regarding defamatory statements about them); *Johnson v. Nickerson*, 542 N.W.2d 506, 511 (Iowa 1996) ("[T]he court [in *Gertz*] prescribed two levels of protection. Speech concerning public officials and public figures was still protected by the actual malice requirement. For speech concerning private parties, however, the states were free to interpret their own law and apply any level of

protection below strict liability.") (citing *Gertz*, 418 U.S. at 346–47, 94 S.Ct. 2997).

Similarly, although Mercer would ordinarily be relieved of the necessity of proving the "falsity" of Chief Byrne's statements, if the statements are slanderous *per se, see Hill*, 71 F.Supp.2d at 953; *King*, 985 F.Supp. at 878; *accord Schlegel*, 585 N.W.2d at 222, the defendants have asserted truth as an affirmative defense. *See* Answer to Second Amended Complaint, Affirmative Defenses, ¶ 8; *see also King*, 985 F.Supp. at 878 ("truth" remains an absolute defense to a defamation action, even one for defamation *per se*, provided the defendant has pleaded and can prove it). Mercer would necessarily have to overcome that defense by proving "falsity" to prevail on her claim. *See King*, 985 F.Supp. at 878.

Nevertheless, a conclusion that Mercer has asserted slander *per se* would relieve her of the necessity of proving damage. *Hill*, 71 F.Supp.2d at 953; *accord Schlegel*, 585 N.W.2d at 222 ("When statements are libelous per se, they are actionable in and of themselves without proof of malice, falsity, or damage.") (also citing *Vinson*, 360 N.W.2d at 116). A conclusion that the statements are slanderous *per se* would also dispose of the defendants' contention that the statements are not even slanderous at all. Therefore, the court will consider this question.

■ Although, in proper circumstances, a court may determine that a statement is defamatory *per se* as a matter of law, whether or not a statement can reasonably be understood as defamatory *per se* may instead present a jury question:

A statement is not defamatory per se if it is susceptible to two reasonable constructions or meanings, one not defamatory. In that case, the jury must decide if the statement is defamatory.

---

The existence of damage to reputation is conclusively presumed from the publication of the libel [or slander]. *Prosser & Keeton* § 112, at 795. In contrast, if a statement is libelous [or slanderous] per quod, the plain-

tiff must prove damage to reputation and consequently any special damages such as mental anguish. *Johnson [v. Nickerson]*, 542 N.W.2d [506,] 510 [(Iowa 1996)]. *Schlegel*, 585 N.W.2d at 222.

*Vinson,* 360 N.W.2d at 116. The focus of this analysis is on the meaning of the statement or how it will be understood by a reasonable person. In *Vinson* we stated:

> The rule is that when the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court. If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed.
>
> . . . .
>
> We believe that a statement that an employee was fired for making incorrect entries on her time card could *reasonably be taken* as imputing dishonesty to the employee. Therefore we find that Williams' statement could be *understood* as defamatory per se. The trial court did not err in allowing the jury to determine whether the defamatory meaning was the one conveyed.

*Vinson,* 360 N.W.2d at 116 (emphasis added).

If a statement can have two reasonable constructions, the jury may then reach one of three possible conclusions: (1) the statement was reasonably understood as defamatory per se; (2) the statement was understood as defamatory, but not defamatory per se (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) the statement was not understood as defamatory. Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner,* 44 Drake L.Rev. 639, 652 (1996).

*Kerndt,* 558 N.W.2d at 418 (emphasis in the original).

The court finds that the procedure outlined in *Kerndt* must be followed in this case, because the statements upon which Mercer's slander claim depends are not unambiguously defamatory *per se. See id.* The court agrees that, in the context of the complete newspaper story, there are

reasonable inferences that Chief Byrne's comments specifically related to Mercer and specifically "affect[ed] [Mercer] in ... her business, trade, profession, or office" as a police officer. *Id.* However, the statements do not unambiguously target Mercer or unambiguously identify her as incompetent, because they are cast in general terms of "people" who do not "meet up" with unidentified standards for a police officer and "any off-duty relationship" that "adversely affects the workplace." Defendants' Attachments To Statement Of Undisputed Material Facts, Deposition Exhibit 1. There are genuine issues of material fact as to whether the statements are defamatory *per se* or even defamatory at all. Thus, it will be for the jury to decide among three possible conclusions: (1) one or both of the statements were reasonably understood as defamatory *per se;* (2) one or both of the statements were understood as defamatory, but not defamatory *per se* (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) the statements were not understood as defamatory. *Id.*

### 4. Falsity

The defendants contend that, even if the statements are found to be defamatory or defamatory *per se,* they are entitled to summary judgment on the ground that the statements are truthful. As the court noted above, the defendants have asserted "truth" as an affirmative defense. *See* Answer to Second Amended Complaint, Affirmative Defenses, ¶ 8; *see also King,* 985 F.Supp. at 878 ("truth" remains an absolute defense to a defamation action, even one for defamation *per se,* provided the defendant has pleaded and can prove it). Thus, Mercer would necessarily have to overcome that defense by proving "falsity" to prevail on her claim. *See King,* 985 F.Supp. at 878.

However, the court concludes that Mercer has generated genuine issues of material fact as to the "falsity" of Chief Byrne's statements for many of the same reasons

she has generated genuine issues of material fact, with regard to her Title VII claim, as to the "pretextual" nature of the defendants' proffered reasons for their actions. Specifically, Mercer has presented enough evidence to raise a jury question on whether she was not "meet[ing] up" with applicable standards in any respect, by pointing to record evidence that she had received only favorable performance evaluations, and by pointing to the lack of any evidence of any actual disruption of any shifts as a result of her relationship with Captain Peters. Thus, the defendants are not entitled to summary judgment on the ground that Mercer cannot prove "falsity" or that they have demonstrated the "truth" of Chief Byne's statements beyond dispute. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

In light of these conclusions, the defendants are not entitled to summary judgment on Mercer's slander claim.

### E. *Wrongful Discharge*

█ The defendants also seek summary judgment on Mercer's final claim, her claim that her discharge was in violation of public policy. *See* Second Amended Complaint, Count IV. Mercer claims that she was terminated in violation of public policy, because she was terminated

(a) For having a private, consensual relationship with another officer of the Cedar Rapids Police Department, which relationship was not a violation of any law, rule, regulation or standard of performance relating to her duties as an officer; and

(b) For communicating with the elected official responsible for Defendant Byrne's department.

*Id.* at ¶ 19.

The defendants contend that they are entitled to summary judgment on this claim, because Mercer was an at-will employee and her termination does not constitute a violation of any well-recognized public policy. The defendants contend that Mercer cannot point to any clearly articulated public policy that protects her from discharge in this case, and that even if she could, her allegations fail on the basis of a lack of supporting facts. Mercer counters that Iowa law clearly recognizes a right to privacy, *inter alia,* by recognizing a tort of invasion of privacy. She contends that her right to privacy was violated by the intrusion of the defendants into her private, consensual relationship with Captain Peters, which did not violate any rule or regulation of the Cedar Rapids Police Department. She also contends that terminating her for her conversation with Public Safety Commissioner Evans plainly violated the public policy of "freedom of speech and association" enshrined in Article I, Section 7, of the Iowa Bill of Rights.

#### 1. *Analytical framework*

Just over a week ago, in *Fitzgerald v. Salsbury Chemical, Inc.,* 613 N.W.2d 275 (Iowa 2000) (*en banc*), the Iowa Supreme Court considered the requirements for a claim of wrongful termination in violation of public policy, and more specifically, the requirements for defeating an employer's motion for summary judgment on such a claim. In *Fitzgerald,* the Iowa Supreme Court explained,

We have identified the elements of an action to recover damages for discharge in violation of public policy to require the employee to establish (1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge. *Teachout v. Forest City Community*

*Sch. Dist.,* 584 N.W.2d 296, 299 (Iowa 1998).

These elements properly identify the tort of wrongful discharge when a protected activity has been recognized through the existence of an underlying public policy which is undermined when an employee is discharged from employment for engaging in the activity. *See Tullis v. Merrill,* 584 N.W.2d 236, 239 (Iowa 1998) (public policy in favor of permitting employees to make demand for wages due gives rise to an action for wrongful discharge for making a demand for wages); *Teachout,* 584 N.W.2d at 299 (public policy of this state in favor of reporting suspected child abuse gives rise to an action for wrongful discharge for reporting or intending to report child abuse); *Lara v. Thomas,* 512 N.W.2d 777, 782 (Iowa 1994) (public policy of this state in favor of permitting employees to seek unemployment compensation gives rise to an action for wrongful discharge for seeking partial unemployment benefits); *Springer [v. Weeks & Leo Co., Inc.],* 429 N.W.2d [558,] 560 [(Iowa 1988)] (public policy of this state in favor of permitting employees to seek workers' compensation for work-related injuries gives rise to an action for wrongful discharge for asserting a right to workers' compensation benefits). However, when we have not previously identified a particular public policy to support an action, the employee must first identify a clear public policy which would be adversely impacted if dismissal resulted from the conduct engaged in by the employee. *See Yockey v. State,* 540 N.W.2d 418, 420–21 (Iowa 1995) (the public policy in favor of permitting employees to seek workers' compensation benefits not jeopardized by termination from employment for missing work following injury); *Borschel v. City of Perry,* 512 N.W.2d 565, 567 (Iowa 1994) (no public policy in favor of presumption of innocence in work place to give rise to an action for wrongful discharge for conduct which resulted in criminal charges); *French [v. Foods, Inc.],* 495 N.W.2d

[768,] 771–72 [ (Iowa 1993) ] (presumption of innocence not an actual public policy).

*Fitzgerald,* 613 N.W.2d at 281–82. (footnote omitted). When the existence of the requisite public policy was at issue, the court noted the following:

Some courts are beginning to articulate the elements of a cause of action for wrongful discharge as:

1. The existence of a clear public policy (the clarity element).

2. Dismissal of employee under circumstances alleged in the case would jeopardize public policy (the jeopardy element).

3. The plaintiff engaged in public policy conduct and this conduct was the reason for the dismissal (the causation element).

4. Employer lacked an overriding business justification for the dismissal (the absence of justification element). *Gardner v. Loomis Armored, Inc.,* 128 Wash.2d 931, 913 P.2d 377, 382 (1996); *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657 (1995).

This approach is derived from the methodology proposed by Dean and Law Professor Henry H. Perrit, Jr. *See generally* Henry H. Perrit, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self–Interest Lie?,* 58 U. Cin. L.Rev. 397–430 (1989). This four part structure of proof is now detailed in Professor Perrit's multi-volume treatise on the subject. *See* Perritt § 7.9, at 18. This is a helpful guide and actually parallels the approach we have followed in addressing the tort on a case-by-case method.

*Id.* at 282 n. 2.

As to summary judgment on such claims, the Iowa Supreme Court observed the following:

It is generally recognized that the existence of a public policy, as well as the issue whether that policy is undermined by a discharge from employment, pres-

ents questions of law for the court to resolve. 2 HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 7.9, at 18 (4th ed.1998) [hereinafter PERRITT]; PAUL H. TOBIAS, LITIGATING WRONGFUL DISCHARGE CLAIMS § 5:22, at 69 (1995) [hereinafter Tobias]; *Roberts v. Dudley,* 140 Wash.2d 58, 993 P.2d 901, 905 (2000) (existence of public policy is a question of law). Thus, these questions are generally capable of resolution by a motion for summary judgment. On the other hand, the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact. TOBIAS § 5:22, at 69–70. Notwithstanding, to withstand summary judgment a plaintiff must not only satisfy the court on the public policy and jeopardy elements of the tort, but offer adequate evidence from which a lack of justification for termination can be inferred. PERRITT § 7.9, at 18.

*Id.* at 282. The court will therefore apply this analysis to the defendants' motion for summary judgment on Mercer's claim that her discharge violated public policy in two respects not before recognized by the Iowa Supreme Court.

### 2. Determining public policy

Under *Fitzgerald,* the first question is to determine whether Mercer has identified any clear public policy as the basis for her claim. *Id.* at 282 & n. 2. As the Iowa Supreme Court explained, that court has been "careful to limit the tort action for wrongful discharge to cases involving only a well-recognized and clear public policy." *Id.* at 282. The court also recognized that it had looked primarily to statutes and the Iowa constitution as sources of well-recognized public policy, but had also looked to judicial decisions and administrative rules. *Id.* The court cautioned that an insistence upon only clear, well-recognized public policy as the basis for a wrongful discharge tort was required in order to balance carefully the competing interests of the employee, employer, and society, including these parties' interest in at-will employ-

ment. *Id.* Specifically, the court warned that "[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself" and "could unwittingly transform the public policy exception into a 'good faith and fair dealing' exception, a standard we have repeatedly rejected." *Id.*

### a. Public policy protection for a private, consensual relationship

■ Mercer contends, first, that her discharge violated the well-recognized public policy of a right to privacy, because she was purportedly terminated for her private, consensual relationship with Captain Peters, even though such a relationship was not a violation of any law, rule, regulation, or standard of performance relating to her duties as a police officer. She contends that such recognition comes from the common-law recognition of privacy protections, embodied, for example, in the recognized tort action for intrusion upon seclusion, citing *Bremmer v. Journal–Tribune Pub. Co.,* 247 Iowa 817, 76 N.W.2d 762 (Iowa 1956). She contends further that this right to privacy is "fundamental," citing *State v. Pilcher,* 242 N.W.2d 348, 359 (Iowa 1976).

The tort of invasion of privacy was recognized by the Iowa Supreme Court in *Bremmer,* in which it was defined as invasion of "the right of an individual to be let alone, to live a life of seclusion, to be free from unwarranted publicity." *Bremmer,* 76 N.W.2d at 764. Since the recognition of the tort in *Bremmer,* the Iowa Supreme Court has adopted and applied the principles of invasion of privacy articulated in the RESTATEMENT (SECOND) OF TORTS (1977). *See Hanson v. Hancock County Mem. Hosp.,* 938 F.Supp. 1419, 1435 (N.D.Iowa 1996) (citing cases). In *Hanson,* this court considered the limited discussion in Iowa law of the tort of intrusion upon seclusion, which is based upon RESTATEMENT (SECOND) OF TORTS § 652A(2)(a):

[I]ntrusion upon seclusion was defined in *Winegard [v. Larsen,* 260 N.W.2d 816 (Iowa 1977) ], as follows:

> Category (a) requires an intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person. § 652B.

*[Winegard,* 260 N.W.2d at 822] . . . . Category (a) of the tort, however, does not require publication. *Lamberto [v. Bown],* 326 N.W.2d [305,] 309 [(Iowa 1982)]; *Winegard,* 260 N.W.2d at 822; *Restatement (Second) of Torts* § 652B, comment a.

To recover under the intrusion upon seclusion theory of the tort,

> a plaintiff must show, first, that the defendant intentionally intruded upon the seclusion that the plaintiff "has thrown about [his or her] person or affairs." Restatement § 652B comment c; *accord Winegard,* 260 N.W.2d at 822. Second, the intrusion must be one that would be "highly offensive to a reasonable person." *Winegard,* 260 N.W.2d at 822; *accord* Restatement § 652B comment c.

*Stessman [v. American Black Hawk Broadcasting Co.],* 416 N.W.2d [685,] 687 [(Iowa 1987)].

*Hancock,* 938 F.Supp. at 1435–36.

The decisions discussed in *Hancock* do stand for the proposition that Iowa common-law generally recognizes, as a matter of public policy, that persons have a right to privacy of their "personal affairs," which would be violated if the intrusion upon such privacy would be "highly offensive to a reasonable person"; thus, as a matter of law, *see Fitzgerald,* 613 N.W.2d at 282 (determination of the existence of public

policy is a question of law), a public policy exists that would protect an employee from a termination of employment arising from such an intrusion upon seclusion. *Compare Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 622 (3d Cir.1992) (predicting that the Pennsylvania Supreme Court would recognize a claim for wrongful discharge in violation of public policy if, after examining the circumstances, the court determined that the discharge resulted in an intrusion upon seclusion that would be highly offensive to a reasonable person, relying on *Rogers v. International Business Machines Corp.,* 500 F.Supp. 867 (W.D.Pa.1980), in which the plaintiff alleged wrongful discharge in violation of public policy on the ground that his discharge following investigation of his affair with a co-worker violated the public policy against intrusion upon seclusion); *Era Aviation, Inc. v. Seekins,* 973 P.2d 1137, 1139 (Alaska 1999) (reiterating that the court had recognized unwarranted intrusions into employee privacy violate public policy and terminating an employee for resisting such an intrusion violates the covenant of good faith and fair dealing).[8]

**b. Public policy protection for contact with Commissioner Evans**

■ However, the court finds no such public policy protecting Mercer from discharge for contacting Commissioner Evans. This is so, because the court finds that there is no public policy of "freedom of association" in Article I, Section 7 of the Iowa Constitution, as Mercer asserts. The cited provision of the Iowa Constitution refers only to freedom of speech and the press, not to freedom of association. *See* Constitution of the State of Iowa, Art. I, Bill of Rights, § 7.[9] Thus, Mercer has

---

8. Although the decision of the Iowa Supreme Court in *State v. Pilcher,* 242 N.W.2d 348 (Iowa 1976), upon which Mercer relies, recognizes a privacy right in consensual sexual activities among consenting adults, that right was grounded in the federal Constitution, not Iowa state public policy. *See Pilcher,* 242 N.W.2d at 359.

9. The provision of the Iowa Constitution to which Mercer cites provides as follows:

> **Liberty of speech and press.** SEC. 7. Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to retrain or abridge the liberty of speech, or of the press. In all prosecutions or indictments for libel, the

failed to identify any basis for public policy protection from termination for contacting Commissioner Evans.[10] Therefore, this part of Mercer's "wrongful discharge" claim founders on the absence of the first requirement of such a claim, the existence of a clear public policy. *Fitzgerald*, 613 N.W.2d at 282 & n. 2. (identifying the first element of a wrongful discharge claim as the existence of a clear public policy and reiterating that the existence of public policy is a question of law for the court that can be determined at summary judgment); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same).

### 3. Jeopardy to public policy

Once a clear public policy is identified, the Iowa Supreme Court held in *Fitzgerald* that "the employee must further show the dismissal for engaging in the conduct jeopardizes or undermines the public policy." *Fitzgerald*, 613 N.W.2d at 284. "Thus, this element requires the employee to show the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the public policy by discouraging the conduct." *Id.* Moreover, "if a public policy exists, but is not jeopardized by the discharge, the cause of action must fail." *Id.* The justification for this requirement is that it "guarantees an employer's personnel management decisions will not be challenged

unless the public policy is genuinely threatened." *Id.* at 284–85. Thus, "[a]n essential element of proof to establish the discharge undermines or jeopardizes the public policy necessarily involves a showing the dismissed employee engaged in conduct covered by the public policy." *Id.* at 286–87. This "jeopardy" element also presents a question of law for the court, which is properly addressed at the summary judgment stage of the proceedings. *Id.* at 282 ("jeopardy" element is a question of law).

As to the public policy against intrusion upon seclusion, the court noted above that the public policy protection of a right to privacy of a person's "personal affairs" would be violated, *i.e.*, "jeopardized," only if the intrusion upon such privacy would be "highly offensive to a reasonable person." *See Hancock*, 938 F.Supp. at 1435–36 (interpreting Iowa cases concerning intrusion upon seclusion to require intrusions that would be "highly offensive to a reasonable person"); *see also Borse*, 963 F.2d at 622 (the Third Circuit Court of Appeals predicted that the Pennsylvania Supreme Court would recognize a claim for wrongful discharge in violation of public policy if, after examining the circumstances, the court determined that the discharge resulted in an intrusion upon seclusion that would be highly offensive to a reasonable person). To put it another way, a dismissal that did not result from an intrusion upon seclusion that was "highly offensive to a reasonable person" would not show that the employee "engaged in [conduct that] furthered the public policy," and would have no "chilling effect on the public

truth may be given in evidence to the jury, and if it appears to the jury that the matter charged as libellous was true, and was published with good motives and for justifiable ends, the party shall be acquitted.
Constitution of the State of Iowa, Art. I, § 7.

10. Mercer cannot, for example, rely on the Iowa "whistle-blower" statute for an applicable public policy, because she does not contend that she contacted Commissioner Evans,

despite orders not to discuss the Internal Affairs investigation with anyone but her attorney, to report any violation of the law by government officials. *See Smuck v. National Management Corp.*, 540 N.W.2d 669, 672 (Iowa Ct.App.1995) (concluding that a wrongful termination claim by a private employee did not fall within the public policy of the Iowa Code § 70A.29, as the statute applies only to public employees who report violations of law to law enforcement officials).

policy by discouraging the [employee's protected] conduct." *Fitzgerald*, 613 N.W.2d at 284.

The court recognizes that if Mercer were employed in typical, private-sector employment, she might well have satisfied the "jeopardy" requirements for her "wrongful discharge" claim. For example, Mercer engaged in conduct ordinarily covered by the public policy against intrusion upon seclusion, a relationship between consenting adults. Although Mercer apparently made no secret of being with Captain Peters in public places on at least two occasions that came to Chief Byrne's attention, the record gives no indication that Mercer had made the intimate nature or details of her relationship with Captain Peters generally known, or engaged in public discussion or display of the intimate aspects of the relationship, until questioned by Chief Byrne and Internal Affairs investigators. Thus, under ordinary circumstances, Mercer may have satisfied the first requirement for invoking the public policy against intrusion upon seclusion, because inquiries into Mercer's relationship with Captain Mercer may well have " 'intruded upon the seclusion that [Mercer] "has thrown about" ' " her relationship with Captain Peters. *Hancock*, 938 F.Supp. at 1435–36 (quoting *Stessman*, 416 N.W.2d at 687, in turn quoting RESTATEMENT (SECOND) OF TORTS § 652B comment c) (identifying the first showing the plaintiff must make to prevail on a tort claim of intrusion upon seclusion). Moreover, were she not employed as a police officer, or in some other like employment context, a personal relationship Mercer described as "romantic" is of such a nature that unwarranted inquiry into that relationship might well be "highly offensive to a reasonable person." *Id.*

However, Mercer is a police officer in a paramilitary organization. Courts have repeatedly held that "[b]ecause police departments function as paramilitary organizations, their members may be subject to stringent rules and regulations that could not apply to other government agencies." *Tindle v. Caudell*, 56 F.3d 966, 973 (8th Cir.1995) (action by a white police officer discharged for wearing a costume at a Halloween party that was deemed offensive to black members of the police department could not assert First Amendment free speech and Fourteenth Amendment due process challenges to his discharge); *Tyler v. City of Mountain Home*, 72 F.3d 568, 570 (8th Cir.1995) (a police department "has a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' ") (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1344 (8th Cir.1993)); *Bartlett v. Fisher*, 972 F.2d 911, 918 (8th Cir.1992) (quoting *Hughes, infra*); *Hughes v. Whitmer*, 714 F.2d 1407, 1419 (8th Cir.1983) ("More so than the typical government employer, the [Missouri Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution'.... Pursuant to this substantial interest, the Patrol, as a paramilitary force, should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks.") (citations omitted), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). For example, " '[r]egulations limiting even those rights guaranteed by the explicit language of the [federal] Bill of Rights are reviewed more deferentially when applied to certain public employees [such as police officers] than when applied to ordinary citizens.' " *Tindle*, 56 F.3d at 973 (quoting *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1408 (8th Cir. 1990)). This deference is accorded "a public safety employer's determinations of both the *potential* for disruption as a result of speech, as well as the employer's response to the actual *or perceived* disruption." *Tyler*, 72 F.3d at 570 (emphasis added) (citing *Shands*, 993 F.2d at 1345).

Recently, in *Wieland v. City of Arnold,* 100 F.Supp.2d 984 (E.D.Mo. 2000), the district court recognized that there is a "continuum of human relationships potentially protected by the freedom of intimate association." *Wieland,* 100 F.Supp.2d at 985 (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). However, the court in *Wieland* also recognized that a police department, as a paramilitary organization, has a more significant interest than the typical government employer in regulating otherwise protected conduct, such that the department's interest outweighed a police officer's associational or privacy interest in continuing a "dating relationship" with an undisputed felon probationer, such that the department's decision to discharge the officer for the relationship did not violate his constitutional privacy and associational rights. *Id.* at 988–89. The court reached this conclusion, even though the department had not shown actual interference with the plaintiff's police duties, because it was not unreasonable for the department to assume a "very real likelihood that [the relationship] could affect the chain of command as well as the public image of the department." *Id.* (reading Eighth Circuit precedent, including *Tindle, Tyler,* and *Shands,* to hold that a showing of actual prejudice is not always required in the balancing process under *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, (1968)).

For the same reasons, inquiries into the nature of a police officer's off-duty relationship with a superior officer, and even termination of a police officer because of an off-duty relationship with a superior officer that the police officer described as "romantic," would not be "highly offensive to a reasonable person," even in the absence of a non-fraternization rule or regulation. Although the intimacy of the relationship ordinarily heightens an individual's interest in the relationship's "privacy," here, the intimacy of the relationship also heightened the police department's interest in inquiring into the relationship to determine its potential for detrimental effects upon the job performance of the individual officers involved, and the relationship's potential for detrimental effects upon the discipline, chain of command, morale, effectiveness, efficiency, and public image of the police department. *Cf. Tyler,* 72 F.3d at 570; *Hughes,* 714 F.2d at 1419; *Wieland,* 100 F.Supp.2d at 988–89. Not only do these matters heighten the police department's interest in pursuing inquiries about the relationship, they heighten the police department's interest in terminating one or both of the participants in the relationship to forestall potential negative effects. *Cf. Tyler,* 72 F.3d at 570; *Wieland,* 100 F.Supp.2d at 988–89.[11] Although similar inquiries and similar consequences in private sector employment or other kinds of governmental or public employment might well "jeopardize" public policy, *see Fitzgerald,* 613 N.W.2d at 284 (requiring "jeopardy" to the public policy), here, as a matter of law, there is no intrusion upon seclusion in the circumstances presented that would be "highly offensive to a reasonable person," such that the public policy against discharges arising from such intrusions is not jeopardized.

---

11. These legitimate concerns largely obviate the concern that Mercer was terminated solely on the basis of Chief Byrne's individual bias or personal disapproval of the "extramarital" nature of the relationship between Mercer and Captain Peters. *Compare Thorne v. City of El Segundo,* 726 F.2d 459, 470–71 (9th Cir.1983) (the lack of standards to assist a polygraph examiner's determination of what might be relevant to job performance or "perverted deviancies" ran the risk that inquiries into personal relationships of applicants for jobs as police officers might be justified on the basis of individual bias and disapproval; moreover, use of the information about an applicant's affair with a police officer, which had resulted in the applicant's pregnancy and a miscarriage, to deny the applicant employment as a police officer violated her privacy rights in the absence of any showing of a job-related impact), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984).

### 4. Summary

Mercer has failed to identify any applicable public policy as to a discharge because of her contact with Commissioner Evans, and cannot demonstrate, in the circumstances presented, as a matter of law, that there was any "jeopardy" to public policy protection against a discharge from employment that intrudes upon her seclusion in a manner that would be "highly offensive to a reasonable person." *Fitzgerald,* 613 N.W.2d at 282 & n. 2 (identifying the elements of a wrongful discharge claim when the existence of a public policy has not been recognized). Therefore, as a matter of law, Mercer cannot establish all of the elements of her "wrongful discharge" claim, and the defendants are entitled to summary judgment on Count IV of Mercer's Second Amended Complaint. *See* FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

### III. CONCLUSION

Although Mercer's federal claims survived a motion to dismiss, on the more complete record now before the court, none of Mercer's federal claims and only one of her state-law claims can withstand summary judgment. Turning first to Mercer's federal constitutional claims in Count I, the court concludes that Mercer has failed to generate any genuine issue of material fact in support of her equal protection claim that she was treated differently than any person who was "similarly situated in all relevant respects," because Captain Peters, to whom she compares herself, was not similarly situated "in contemplation of law," where he was a permanent employee, and she was only a probationary employee. As to her due process claim, the court finds that the public comments attributed to Chief Byrne are not sufficiently stigmatizing to sustain Mercer's "procedural" due process claim as a matter of law, because they only comment on her professional competence. Neither comment accuses Mercer of dishonesty, immorality, criminality, racism, or the like, or otherwise suggests that she was guilty of moral turpitude. Nor considering the context of the comments and the record as a whole is there any reasonable inference that the comments carry such a stigma. The court also concludes Mercer's eleventh hour assertion that she is also alleging a violation of "substantive" due process fails, even assuming such a claim could be recognized, because, as a matter of law, a governmental decision to fire a probationary employee but retain a permanent employee purportedly engaged in the same conduct is neither "arbitrary and capricious" nor "truly irrational."

The court concludes that Mercer's Title VII claim of sex discrimination, in Count II, and her state-law claim of gender discrimination, in Count V, fail as a matter of law, at the third stage of the *McDonnell Douglas* burden-shifting analysis, as that analysis was recently clarified in *Reeves.* The record here conclusively reveals another, nondiscriminatory reason for the employer's apparently disparate treatment of Mercer and Captain Peters—the fact that they are *not* similarly situated *in contemplation of law*—even though Mercer has established a *prima facie* case and has set forth sufficient evidence to reject the defendant's explanation for her discharge. In these circumstances, no rational factfinder could conclude that the action was discriminatory, because Mercer and Captain Peters were not "similarly situated in all relevant respects."

Similarly, Mercer's state-law "wrongful discharge" claim in Count IV of her Second Amended Complaint fails as a matter of law. Mercer has failed to point to any adequate public policy protection for her conversation with Commissioner Evans, so that summary judgment on the portion of the wrongful discharge claim premised on a discharge in retaliation for that conversation is appropriate. Although the court finds that, as a matter of law, there is a public policy of the State of Iowa that protects an employee from intrusions upon seclusion of private relationships where such intrusions are highly offensive to a reasonable person, as a matter of law, that public policy is not "jeopardized" in this case. Although intrusion upon the privacy of an employee's off-duty, consensual relationship with another co-worker might be highly offensive in private sector employment, or even in some sectors of public employment, the intrusion is not highly offensive here. The relationship upon which intrusion was purportedly made in this case is between police officers in a public safety, paramilitary organization. Intrusion upon such a relationship in this context is not highly offensive to a reasonable person, because of the potential for detrimental effects of such a relationship upon the job performance of the individual officers involved, and the relationship's potential for detrimental effects upon the discipline, chain of command, morale, effectiveness, efficiency, and public image of the police department. Thus, the defendants are entitled to summary judgment on this claim as well.

Only one of Mercer's state-law claims fares better. Although the comments attributed to Chief Byrne in the newspaper story about Mercer's discharge are not sufficiently "stigmatizing" to sustain Mercer's due process claim, the defendants are not entitled to summary judgment on Mercer's common-law slander claim. The court finds that the qualified privilege defense is available to the defendants as a matter of law. However, the defendants are not entitled to summary judgment on the slander claim on the basis of this de-

fense, because there are genuine issues of material fact as to whether or not the defendants can prove the "good faith" element of the defense or Mercer can instead overcome the defense by showing that Chief Byrne acted with "actual malice." Furthermore, the court finds that there are genuine issues of material fact as to whether the comments in question are defamatory or defamatory *per se,* which necessitate submission to the jury of the following questions: (1) whether one or both of the statements were reasonably understood as defamatory *per se;* (2) whether one or both of the statements were understood as defamatory, but not defamatory *per se* (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) whether the statements were not understood as defamatory. Finally, the court also concludes that there are genuine issues of material fact as to the "falsity" of the statements upon which Mercer's slander claim relies.

Therefore, the defendants' motion for summary judgment is **granted** as to Counts I (constitutional claims), II (Title VII claim), IV (state wrongful discharge claim), and V (state sex discrimination claim) of Mercer's Second Amended Complaint. However, the defendants' motion for summary judgment is denied as to Count III (slander) of Mercer's Second Amended Complaint.

**IT IS SO ORDERED.**